[No. S004521. Crim. No. 23039. June 8, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID LESLIE MURTISHAW, Defendant and Appellant.

**COUNSEL**

Hill, Schwartz & Stenson, David H. Schwartz, Michael P. Guta and Ernest L. Graves for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Ward A. Campbell and Eddie T. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**EAGLESON, J.**—A jury convicted David Leslie Murtishaw of three counts of first degree murder and one count of assault with intent to commit

murder. (Pen. Code, § 187; former § 217.)[1] The jury also sustained one firearm-use allegation (§ 12022.5) and one multiple-murder special-circumstance allegation. (Former § 190.2, subd. (c)(5).) After a penalty trial, the jury set the penalty at death under the 1977 death penalty law. (See former § 190.1 et seq.; Stats. 1977, ch. 316, §§ 7-13, pp. 1257-1262.) This court affirmed the guilt and special circumstance findings but reversed the penalty judgment. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446] (*Murtishaw I*).) After a penalty retrial, a jury once again determined that defendant should suffer the ultimate punishment. This appeal is automatic. (§ 1239, subd. (b); former § 190.4, subd. (e).)

We reject defendant's attempt to reopen the validity of the guilt judgment. Furthermore, we find no error at the second penalty trial which warrants reversal of the verdict. We therefore affirm the judgment in full.

FACTS

A. *Guilt trial.*

As our original opinion discloses (*Murtishaw I, supra,* 29 Cal.3d at pp. 743-749), defendant killed three college students near Mojave on April 9, 1978. That morning, defendant and his brother-in-law Gregory Laufenberger acquired two .22-caliber rifles, purchased beer and cartridges, and went shooting in the desert. When defendant's car broke down, defendant fired several shots at the vehicle in frustration.

Later, the two men encountered four University of Southern California students, Lance Buflo, Martha Soto, James Henderson, and Ingrid Etayo, who were making a film for Buflo's cinema class. The film's plot involved a stranded motorist who shoots at a hooded figure of death (Etayo) before succumbing to thirst and heat. The students were using a .38 revolver with blank cartridges as a prop.

Defendant and Laufenberger asked the students for a ride to town to arrange car repairs; the students said they would comply when the day's filming was done. During the afternoon, the two men drank beer steadily and watched the film production. According to Laufenberger, defendant suggested several times that they shoot the students; "he wanted to steal [their] car or something."

About 5 p.m., the students completed filming, placed the prop revolver in a satchel, and prepared to leave. Defendant followed them toward their car

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

and then began shooting at them from a range of 80 feet. Soto fell immediately with a head wound from which she died two days later. A bullet struck Henderson in the shoulder. The firing continued despite pleas to stop and shouts that people were injured. Henderson was killed by a hail of bullets when he dashed for help from behind the students' car. Laufenberger saw defendant reload and resume shooting. Buflo was wounded in the hand. The still-hooded Etayo, already wounded in the arm, came toward defendant and begged for mercy. He told her to stop or he would shoot; she received a fatal head wound at close range. Buflo, running for the highway, looked back and saw defendant standing over Etayo, who was sitting next to the prone Soto. Buflo escaped, flagged down help, and notified the police.

Defendant told Laufenberger he did not know why he had shot the students. The two men threw away their guns and hitchhiked home.

Early the next morning, defendant turned himself in to the police. In his statement, he claimed he heard shots as he approached the students' car, became confused, and believed the students were firing at him with the revolver used in the film. He then emptied his entire rifle clip in the students' direction. He heard Laufenberger shout, "throw out your gun." He reloaded and shot a hooded figure who approached despite his warning. After the firing was over, he rejected Laufenberger's suggestion to take the students' car because gasoline was leaking from bullet holes in the tank. Defendant denied telling Laufenberger earlier that he wanted to steal the vehicle.

Before trial, defendant withdrew his insanity plea and relied solely on a defense of diminished capacity. Three prosecution experts testified that defendant was able to premeditate, deliberate, and form the intent to kill. They noted he had no history of mental illness, was not severely inebriated, and acted rationally in many respects. Dr. Siegel, a psychopharmacologist, rejected claims that defendant, a chronic drug user, had acted in a PCP-induced "fugue state." The prosecution experts concluded defendant was under severe domestic stress and reacted violently to frustration without care for the consequences. The sole defense expert, Dr. Kelly, agreed with much of the prosecution's mental analysis. However, he claimed defendant acted in a dream-like "fugue state," in which time and reality were distorted and defendant lacked conscious control. The jury convicted defendant of all charges.

B. *Penalty retrial.*

In its case-in-chief at the penalty retrial, the prosecution again introduced evidence of the crime scene events and of defendant's culpable mental state. No other aggravating evidence was presented.

Defendant presented mitigating evidence falling into three categories: character, drug use, and organic brain dysfunction. His character evidence came largely from his wife and father, although his brothers, his coworkers, and his wife's ex-husband also testified. The evidence of drug use and brain damage came largely from four expert witnesses. Their testimony was rebutted by the testimony of several prosecution experts.

Defendant's father, Henry Murtishaw, recounted defendant's early years. Defendant was one of five children. While still a young child, defendant's mother Carol was committed to a state mental hospital for three months due to her profound depression. Henry recalled his wife would sit and do nothing for hours and then suddenly become very animated. Henry repeatedly abandoned the family but always returned. However, he left for good when defendant was eight years old, apparently unable to tolerate his wife's erratic behavior. He admitted he did not spend much time with his children and did not know how they managed when his wife was depressed. Defendant apparently became a loner, did poorly in school, and then dropped out after the ninth grade. Henry did not recall having any trouble with defendant and described him as an "average boy," "sometimes bullheaded," a "loudmouth," but "thoughtful."

Defendant's wife, Melody Murtishaw, testified she became friends with defendant when he was in his teens and she lived across the street from him. At the time, Melody was in her twenties, married, and the mother of three children. She divorced her husband and, despite opposition from defendant's family, eventually married defendant shortly before his 18th birthday. She described defendant as very good to her children; they called him "Daddy Dave." He provided for the family with his earnings from his job, enabling her to terminate her welfare benefits. However, in the weeks just before the crime, she said defendant was depressed over his recent hernia operation. In addition, for financial reasons, the family had been forced to vacate their apartment and move in with Melody's ex-husband, James Varnum. Although they got on fairly well with Varnum, she admitted the house was crowded and the situation was "strange."

Melody described defendant as a warm and gentle person who would walk away from a fight. She said he never struck her in anger, although he had struck her when, while intoxicated, she became violent. She admitted she drank heavily and recounted one incident when she was quite drunk and was attempting to consume a handful of pills. Defendant then forcibly prevented her from eating the pills. Varnum testified and concurred in Melody's description of defendant, saying he had never seen defendant fight and that defendant was a "very level headed guy."

On the morning of the crime, Melody recalled she asked defendant to kill a deformed kitten to which their cat had given birth. He complied, burying the dead kitten in the yard. She noted he was crying when he returned from the yard.

Defendant's history of drug abuse was recounted by two prosecution experts as well as some lay witnesses. Drs. Matychowiak and Siegel examined defendant and reported he told them he began experimenting with illicit drugs at age 13, including marijuana, various barbiturates and amphetamines, and sniffing gasoline. Several defense witnesses testified defendant often drank beer and smoked marijuana, and Melody asserted he regularly used LSD and Valium. In addition, she, Varnum, a coworker, and one of defendant's brothers all testified that they had observed defendant smoking PCP-laced cigarettes on occasion. Melody also averred that defendant smoked PCP-laced cigarettes up to three times a week during the period just prior to the crime. This three-times-a-week schedule was consistent with defendant's statements to Dr. Siegel. However, Victor Kumelin, a prison counselor who testified for the prosecution, stated that although defendant admitted an extensive abuse of other drugs, he told Kumelin he had only used PCP twice in his life, the second time being the day before the murder.

The night before the murders, Melody testified defendant came home from work saying he had smoked some PCP-laced cigarettes with a coworker. Later, other friends came over and they all drank "boilermakers" (whiskey and beer combinations), and smoked hashish and "chemically treated" marijuana.

Dr. Analine testified for the defense and described the behavior of one who has ingested PCP as predictably unpredictable. In general, PCP ingestion causes frustration, aggressive behavior and psychomotor effects ranging in severity from experiencing a disassociative state to a grand mal seizure similar to that caused by epilepsy. Moreover, PCP is stored in the brain and the body's fatty tissues and is spontaneously released back into the bloodstream during periods of dehydration such as that caused by exposure in the desert. (Both Dr. Siegel and another defense expert, Dr. Blinder, concurred in this latter point.) Dr. Analine concluded that defendant suffered a transient psychotic episode due to PCP intoxication and, despite the conflicting evidence, believed that defendant was sufficiently mentally impaired that he could not premeditate, deliberate, or form the intent to kill.

There was conflicting expert testimony whether defendant's acts of reloading the rifle and of roaming from bush to bush during the attack was consistent with PCP intoxication or with a psychomotor seizure as a result

of such intoxication. Dr. Analine testified that defendant's act of reloading the rifle in the middle of the attack could have been possible even if defendant was intoxicated with PCP if the reloading act was familiar and repetitive. Dr. Walsh, a prosecution witness, testified the usual length of a seizure was one to two minutes and that one would not be able to perform coordinated activity during this period. However, a confused state usually follows the seizure period where the subject could perform some complex tasks. Dr. Albin, another prosecution witness, testified that psychomotor seizures usually last less than a minute and often are merely seconds in duration. Albin further explained that defendant's act of running from bush to bush shooting at and hitting human targets was inconsistent with his having suffered a psychomotor seizure.

Concerning the evidence of potential organic brain dysfunction, the defense called Dr. George Thompson. Dr. Thompson, an acknowledged expert in electroencephalography, testified he administered two electroencephalograms (EEG's) to defendant. The first EEG was conducted under normal conditions and the results were abnormal though not markedly so. The second EEG was performed after defendant was intoxicated by alcohol and barbiturates. Dr. Thompson testified the results of this second test showed defendant had scar tissue in his brain and suffered from "acute pathological alcoholic intoxication," a condition which characteristically manifests itself in episodes of violence, assaultive behavior, and spotty amnesia after the subject ingests alcohol.

On cross-examination, Dr. Thompson admitted there was a subjective component to interpreting the results of an EEG, that the patient's history was important, and that he had read Buflo's and defendant's statements to police as well as the reports of other experts who had examined defendant. He was not aware defendant threatened to kill the victims hours before the killing, that defendant spoke in a rational manner shortly before the slayings, that he stopped and reloaded his rifle several times during the deadly attack, or that defendant was able to draw police a map of the crime scene shortly after his arrest.

Another defense witness, Dr. Blinder, testified he was a psychiatrist and had examined defendant and concluded defendant suffered from acute brain syndrome in remission, chronic brain syndrome in partial remission, and an addictive personality. He averred that defendant's mental instability was caused by a confluence of these conditions aggravated by defendant's use of drugs and alcohol, his lack of food and sleep, dehydration, his family history, and the bizarre film he saw being made.

In rebuttal, the prosecution called Drs. Walsh, Albin, and Badgley, all of whom testified that defendant's EEG's were within the normal range and

did not exhibit evidence of psychomotor seizure or acute pathological intoxication. Dr. Walsh testified that Dr. Thompson used an improper voltage when he administered his EEG's to defendant.

The prosecution also called Jerry Rothenberger, defendant's work supervisor, who testified that defendant had attendance and quality problems and drank during lunch hour. Rothenberger said that, during one angry confrontation, defendant brandished a crescent wrench, clenched his fist, and told Rothenberger to "get the hell away from him."

In surrebuttal, the defense called Dr. Postigo, a neurologist, who testified defendant's EEG was consistent with a diagnosis of underlying seizure disorder, thus supporting Dr. Thompson's conclusions.

### DISCUSSION

A. *Validity of murder convictions.*

Defendant first urges, as he did in his prior appeal, that his murder convictions must be reversed because the trial court failed to instruct sua sponte on the defense of unreasonable self-defense. In *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1], we held that an honest though unreasonable belief in the need for self-defense is sufficient to negate the existence of malice and reduces a homicide from murder to manslaughter. (Pp. 674-680.) We further ruled that in trials held after the *Flannel* decision, the trial court must instruct the jury sua sponte on the unreasonable self-defense doctrine when the evidence so warrants, but that this rule would not apply to cases tried before the *Flannel* decision. (P. 683.)

In his first appeal, defendant argued that *Flannel* should apply to his case even though his trial preceded that decision. We rejected the claim, reasoning "that the trial court need instruct *sua sponte* only on established general principles of law, for it would impose too onerous a burden to require the court to research and expound obscure doctrines not presented by the litigants. In view of the hitherto undeveloped state of the unreasonable self-defense doctrine, we concluded that failure to instruct on it *sua sponte* was not reversible in cases," like defendant's, that were tried before the *Flannel* decision was announced. (*Murtishaw I,* 29 Cal.3d at p. 760.)

██ Defendant now asserts that he is entitled to the benefit of *Flannel* under the rule of *Griffith* v. *Kentucky* (1987) 479 U.S. 314 [93 L.Ed.2d 649, 107 S.Ct. 708]. He is mistaken.

In *Griffith,* the high court did disavow its prior suggestion (see *United States* v. *Johnson* (1982) 457 U.S. 537, 553-554 [73 L.Ed.2d 202, 216-217,

102 S.Ct. 2579]) that new rules of criminal procedure which constitute "clear breaks" with the past need not be applied retroactively. The *Griffith* court declared that henceforth, "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." (479 U.S. at p. 328 [93 L.Ed.2d at p. 661].)

*Griffith* does not undermine defendant's convictions. In the first place, they may well have been "final" for purposes of *Griffith* by the time that decision was announced. We had already affirmed them on appeal, and defendant's petition for certiorari had been denied. For this reason alone, *Griffith*'s application is doubtful. (479 U.S. at p. 321, fn. 6 [93 L.Ed.2d at p. 657]; but see, e.g., *People* v. *Stanworth* (1974) 11 Cal.3d 588, 595-596 [114 Cal.Rptr. 250, 522 P.2d 1058]; *People* v. *Ketchel* (1966) 63 Cal.2d 859, 865-866 [48 Cal.Rptr. 614, 409 P.2d 694].)

In any event, we conclude *Griffith* applies only to rules based on the federal Constitution, or upon the federal judicial supervisory power. *Griffith* itself decided the retroactivity of a new federal constitutional rule, that which precludes racially discriminatory use of peremptory challenges. (*Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712], overruling *Swain* v. *Alabama* (1965) 380 U.S. 202 [13 L.Ed.2d 759, 85 S.Ct. 824].) In *Griffith,* the court expressly addressed the framework for deciding the retroactivity of "new *constitutional* rules of criminal procedure" as developed in *Linkletter* v. *Walker* (1965) 381 U.S. 618 [14 L.Ed.2d 601, 85 S.Ct. 1731], and its progeny. (479 U.S. at p. 320 [93 L.Ed.2d at p. 656], italics added.) *Griffith*'s analysis proceeded on the assumption, among others, that "basic norms of *constitutional* adjudication" are violated when courts deny application of "a newly declared *constitutional* rule" to all pending litigants save the one whose case was used to announce it. (*Id.*, at pp. 322-323 [93 L.Ed.2d at pp. 657-658], italics added.)

We need not extend this analysis to rules of criminal procedure derived solely from state law. As the United States Supreme Court stated long ago, "[t]he federal constitution has no voice upon the subject [of retroactivity of a new rule of state law]. A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward." (*Gt. Northern Ry.* v. *Sunburst Co.* (1932) 287 U.S. 358, 364 [77 L.Ed. 360, 366, 53 S.Ct. 145, 85 A.L.R. 254].)

Defendant urges that the sua sponte instruction rule of *Flannel* is constitutionally based, and therefore "retroactive" under *Griffith,* because he has a due process right to have the jury decide every material issue in the case.

However, the rule of unreasonable self-defense clarified in *Flannel* is one of state common law. ██ Defendant cites no authority, and we are aware of none, that federal due process requires a sua sponte instruction on every conceivable theory of defense raised by the evidence.[2]

Nor does this case implicate *Griffith's* concerns for fairness among litigants. As we explained in *Murtishaw I,* "we [did not hold] that the trial judge in *Flannel* erred by failing to instruct *sua sponte* on unreasonable self-defense, [then refuse] to give that holding retroactive effect. In fact, we held that the [*Flannel*] trial judge *did not* err" by failing to give an unreasonable self-defense instruction *in the absence of a request,* since that theory of manslaughter was so obscure before *Flannel* that it did not invoke the duty to instruct on "established general principles of law." (29 Cal.3d at pp. 760-761, quoted italics in original.) "Applying this reasoning, we further held that Flannel himself could not predicate error on the court's failure to instruct *sua sponte* at his trial. Thus even if we applied *Flannel* retroactively to the present case, defendant here would be entitled to no greater benefit than that accorded Flannel himself; he would not be entitled to posit error on the trial court's failure to instruct *sua sponte.*" (*Ibid.*)

In our view, *Griffith* thus has no compulsory effect on this case, and we still find persuasive the prospective-only reasoning of *Flannel* and *Murtishaw I.* No basis appears to reopen and reverse the convictions. Accordingly, we turn to defendant's claims arising from his retrial on the issue of penalty.

### B. *Change of venue.*

 Defendant argues the trial court erred by denying his pretrial motion for a change of venue. The applicable principles are well settled.

---

[2] The *state* constitutional right to have the jury decide all material issues requires instructions on all *lesser included offenses.* (E.g., *People* v. *Ramkeesoon* (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613]; see *People* v. *Geiger* (1984) 35 Cal.3d 510, 519 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055] [defendant may *request* instructions on lesser *related* offenses]; but cf., *Keeble* v. *United States* (1973) 412 U.S. 205, 212-213 [36 L.Ed.2d 844, 850, 93 S.Ct. 1993].) The federal Constitution requires instructions on all lesser included *offenses* in capital cases. (*Beck* v. *Alabama* (1980) 447 U.S. 625, 638, 643 [65 L.Ed.2d 392, 403, 406, 100 S.Ct. 2382].) "In contrast to *Beck,* the court in the present case instructed the jury on the elements of the pertinent lesser included offenses and made it clear that the jury could return a verdict finding defendant guilty of such offenses. . . ." (*Murtishaw I,* 29 Cal.3d at p. 762.) These instructions defined express and implied malice, explained that malice is necessary for murder, and advised that an unlawful killing without malice is manslaughter. They thus allowed the guilt jury to decide that defendant was guilty only of manslaughter if he acted from an honest, though unreasonable, belief in necessity. On the other hand, "the trial judge cannot be required to anticipate every possible *theory* that may fit the facts of the case before it and instruct the jury accordingly. . . ." (*Flannel, supra,* 25 Cal.3d at p. 683, quoting *People* v. *Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116], italics added; see also *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715-717 [112 Cal.Rptr. 1, 518 P.2d 913].)

■ "A change of venue must be granted when the defendant shows a reasonable likelihood that a fair trial cannot be had in the original county. [Citation.] When reviewing the denial of a motion for change of venue, the appellate court makes an independent determination of five controlling factors: the gravity and nature of the crime, the extent and nature of the publicity, the size and nature of the community, the status of the victim, and the status of the accused. [Citation.] On postconviction review, we must also examine the voir dire of prospective and actual jurors to determine whether pretrial publicity did in fact have a prejudicial effect. [Citation.]" (*People* v. *Balderas* (1985) 41 Cal.3d 144, 177 [222 Cal.Rptr. 184, 711 P.2d 480]; see also *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1130-1131 [240 Cal.Rptr. 585, 742 P.2d 1306]; *Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 578 [174 Cal.Rptr. 701, 629 P.2d 502]; *People* v. *Harris* (1981) 28 Cal.3d 935, 948-950 [171 Cal.Rptr. 679, 623 P.2d 240].)

■ After examining the five factors, we conclude the trial court correctly denied the change of venue motion. This being a capital case, the gravity and nature of the crimes militate in favor of a change. However, the other four factors either are neutral or support the trial court's decision to deny the motion.

For example, Kern County, the site of defendant's 1982 penalty retrial, had a population of 405,600 persons in 1981. (*Balderas, supra,* 41 Cal.3d at p. 178.) "Cases in which venue changes were granted or ordered on review have usually involved counties with much smaller populations." (*Id.,* at pp. 178-179, and cases cited.) Defendant characterizes Kern County as similar in size to Stanislaus County, from which we ordered a change of venue in *Fain* v. *Superior Court* (1970) 2 Cal.3d 46 [84 Cal.Rptr. 135, 465 P.2d 23]. He is mistaken, however; at the time of *Fain,* Stanislaus County had a population of only 184,600. (*Id.,* at p. 52, fn. 1.)

Neither defendant nor his victims were residents of Kern County, nor were they particularly well-known in the county. None belonged to a racial or other group that was likely to evoke either unusual sympathy or antipathy within the community. (See *Martinez, supra,* 29 Cal.3d at pp. 584-585.)

The final factor to consider is the extent and nature of the pretrial publicity. Defendant does not describe this factor in his briefs, but it appears most of the news articles and broadcasts pertaining to this case were largely factual and noninflammatory, and that they occurred during the time of the original trial three years before.[3]

---

[3] In denying a motion to sequester the jury following voir dire, the trial court remarked that it could recall only one article published about the case during the voir dire proceedings.

Instead of describing the publicity in depth, defendant relies on expert evidence introduced below concerning the effect of such publicity on the jury pool. A poll taken by defendant's expert, Dr. Newell, allegedly discovered that 73 percent of the county's population had heard of the killings, that 45 percent were aware that defendant had received the death penalty, and that 44 percent would more than likely again vote for death. The first of these figures is essentially the same as that found by a prosecution expert, Dr. Falero.

However, the other two of defendant's figures are misleading. To reach the figure that 45 percent were aware "defendant" had previously received the death penalty, a random sample of 297 persons were asked if they recalled the triple murder and 217 answered in the affirmative. Of those 217, 112 believed someone was brought to trial. Of those 112, 51 recalled there being a guilty verdict in the case. Finally, of those 51, only 23—or 45 percent of 51—recalled the perpetrator (not defendant specifically) was given the death penalty. However, those 23 comprised only 7.7 percent of the total 297 persons sampled. As the trial court noted, this evidence is insufficient to conclude defendant could not receive a fair trial in Kern County.

Similarly, although 44 percent of 219 persons sampled responded it was more likely they would vote for the death penalty if they knew a previous jury had already found the defendant guilty of murder, an almost equal number (42 percent) answered they could not say, and 13 percent answered it was more likely they would not vote for the death penalty. Moreover, there was no showing these findings would not be duplicated in other counties, rendering them of limited value. (*Balderas, supra,* 41 Cal.3d at pp. 180-181.)

Finally, an examination of the voir dire of the jurors actually selected to serve does not demonstrate defendant's jury was prejudiced by pretrial publicity. (*Anderson, supra,* 43 Cal.3d at p. 1131.) Five jurors had not heard of the case at all and all but one of the others recalled the case in only general terms.[4] There is, of course, no requirement " 'that the jurors be totally ignorant of all the facts and issues involved. . . . It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " (*Balderas, supra,* 41 Cal.3d at p. 180, quoting *Irvin* v. *Dowd* (1961) 366 U.S. 717, 722-723 [6 L.Ed.2d 751, 755-756, 81 S.Ct. 1639].)

---

[4] Juror Flanagan admitted he followed the case fairly closely during the first trial since he was in the hospital and watched a lot of television at the time. However, he affirmed his ability to keep an open mind, to examine the evidence impartially, and to render a just verdict based only on the evidence presented in court.

On balance, considering all five factors, we conclude the trial court correctly denied defendant's motion to change venue.[5]

## C. *Flannel instruction at penalty retrial.*

Defendant urges that the penalty judgment must be reversed because the trial court violated his Sixth, Eighth, and Fourteenth Amendment rights by failing to give, sua sponte, a *Flannel* instruction at the penalty retrial. ■ He further claims that the failure to so instruct *precluded* the jury from considering the evidence adduced at the penalty retrial which was suggestive of an unreasonable belief in the need for self-defense.

We may quickly reject this latter contention. The jury was instructed that a defendant's *reasonable* belief in moral justification was a mitigating circumstance (§ 190.3, factor (f); see former § 190.3, factor (e)), thus possibly raising the negative inference that an *unreasonable* belief was not a proper consideration. However, the jury was also instructed to consider in mitigation "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (§ 190.3, factor (k); see former § 190 .3, factor (j).) Had the jury believed defendant's evidence that he harbored an honest but unreasonable belief in the need for self-defensive action, the instructions permitted consideration of that information as a mitigating factor under factor (j)-(k). (*People* v. *Ghent* (1987) 43 Cal.3d 739, 776 [239 Cal.Rptr. 82, 739 P.2d 1250].)[6]

In addition, we remain unpersuaded that a trial court has a constitutional duty to instruct sua sponte on unreasonable self-defense at the penalty phase of a capital trial. As stated *ante,* the court gave the factor (j)-(k) instruction which, coupled with the arguments of counsel, adequately informed the jury that they could consider such evidence as a mitigating

---

[5] Defendant's reliance on *Murphy* v. *Florida* (1975) 421 U.S. 794 [44 L.Ed.2d 589, 95 S.Ct. 2031], for the proposition that he need show no prejudice, is unavailing for two reasons. First, he inaccurately quotes from that case. Second, the publicity surrounding his penalty retrial did not come close to the carnival atmosphere which has prompted the high court to reverse for denial of a fair trial without a showing of prejudice. (See *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 351-352 [16 L.Ed.2d 600, 613-614, 86 S.Ct. 1507].)

[6] Contrary to defendant's suggestion, the instructions given thus did not force counsel to argue that defendant's drug-induced perception of danger was somehow "reasonable" in order to cite it as a mitigating factor. Indeed, the record suggests that counsel's argument adroitly avoided the distinction between "reasonable" and "unreasonable" self-defense. Counsel simply said, "Now here's another mitigating factor, and this is kind of complicated. I am going to read the official instructions so that you will understand it. It may be unrecognizable by the time I get through with it. It's whether or not the offense was committed under circumstances which the defendant believed to be a moral justification or extenuation for his conduct. Ok. Now, this is what happened. . . ." The word "reasonable" was omitted from counsel's description.

factor. The trial court thus fulfilled its legal obligation to instruct the jury on the general principles of law applicable to the penalty trial. (Cf. *People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311] [concerning whether the trial court had a sua sponte duty to instruct on lesser degree of homicide].)

Defendant suggests that Fifth and Eighth Amendment concerns particularly required a penalty phase *Flannel* instruction in this case, since he had been *convicted* of capital murder without proper instructions on unreasonable self-defense. He urges that the importance of "lingering doubts" about his guilt, as a bar to execution, was therefore great. But this argument assumes premises we have already rejected. At defendant's pre-*Flannel* guilt trial, the jury was fully instructed on the definitions of malice and the degrees of homicide. The lack of further instructions explaining the particular theory of unreasonable self-defense neither denied him basic fairness nor undermined the fundamental reliability of the guilt judgment. The factor (j)-(k) instruction given at the second penalty trial allowed the sentencer to consider any "lingering doubts" about the culpability of defendant's conduct. No error appears.

### D. *The "circumstances of the crime"; factor (a).*

Because we previously affirmed both the guilt and special circumstance findings, the trial court instructed the jury retrying the penalty phase that "[t]he defendant in this case has been found guilty of murder in the first degree. [T]he charge that the murder committed under a special circumstance has been specially found to be true." The court then gave the standard instruction based on section 190.3 of the 1978 death penalty law setting forth the various aggravating and mitigating factors to consider. These included factor (a): "[t]he circumstance of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true." The jury also received instructions in the language of the 1978 law that it "shall" impose death or life without parole depending on the relative weight of the aggravating and mitigating circumstances.[7]

The jury retired to deliberate but soon sent the judge a note inquiring about the meaning of the term "special circumstances" as used in the instruction. With the consent of both the prosecutor and defense counsel, the judge informed the jury that "[i]n any case in which a conviction is found involving first degree murder, the jury must determine if given the

---

[7]Sentencing instructions based on the 1978 law were inadvertently given though this case actually came under the previously effective 1977 statute. Defendant's claims that this mistake warrants reversal are discussed below.

question whether or not certain special circumstances exist, and those special circumstances are enumerated in the Penal Code. *In this particular case, the special circumstance that has already been found to be true and exist is that the homicide is a multiple homicide, that is, three victims, as you have heard from the evidence.* You are not to decide that issue, that's already been found as being true." (Italics added.)

Defendant now launches a multi-pronged attack on both the standard instruction and the judge's comments in response to the jury inquiry. None of his arguments has merit.

He first contends that the trial court's response to the jury inquiry regarding the special circumstance improperly led the jury to believe the prior special circumstance "finding" was itself an aggravating factor *in addition to* the circumstances of the crime under factor (a). He claims that while a penalty jury which had first determined guilt would have properly understood factor (a) was but a single aggravating factor, the failure to define the term "special circumstance" adequately for this jury left it with the misapprehension that factor (a) set forth two aggravating factors rather than one. He claims the trial court's failure to explain the meaning of the term "special circumstances" more fully led to twin evils: the jury could have believed the special circumstance "finding" (as opposed to the facts supporting the finding) was a nonstatutory aggravating factor independent of the underlying facts (*People* v. *Boyd* (1985) 38 Cal.3d 762, 772-779 [215 Cal.Rptr. 1, 700 P.2d 782]), or it could have double-counted the multiple murder as both a special circumstance "finding" and a circumstance of the offense under section 190.3, factor (a).

We do not read the instruction or the judge's response to the jury inquiry so hypertechnically. Instead, we believe a reasonable jury (*People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 9 [196 Cal.Rptr. 309, 671 P.2d 813]; see *California* v. *Brown* (1987) 479 U.S. 538, 541-542 [93 L.Ed.2d 934, 940, 107 S.Ct. 837]) would understand that the prior jury's special circumstance "finding" simply rendered defendant eligible for the death penalty, while the facts supporting any such special circumstance "found to be true" were relevant to determination of the appropriate penalty. (See *People* v. *Keenan* (1988) 46 Cal.3d 478, 520 [250 Cal.Rptr. 550, 758 P.2d 1081].)

The jury was not misled to believe that it need only count the relative *number* of aggravating and mitigating factors. (See *People* v. *Hendricks* (1988) 44 Cal.3d 635, 652-653 [244 Cal.Rptr. 181, 749 P.2d 836].) Moreover, the aggravating effect of three concurrent homicides was manifest. Hence, we see no danger the jury gave undue separate aggravating weight to

the fact that a special circumstance "finding" had been made. (See *Keenan, supra,* 46 Cal.3d at pp. 519-520.)

Defendant also maintains that the instructions prevented the jury from exercising its own discretion to assign a relative weight to the special circumstance. However, we fail to see how the jury's understanding that it must accept the existence of the special circumstance finding prevented it from properly weighing the information under factor (a). In any case, any possible prejudice was dispelled by the prosecutor's argument, which was consistent with our admonition that each juror should be "free to assign whatever moral or sympathetic value he deems appropriate to each and all the various factors he is permitted to consider, . . ." (*People v. Brown* (1985) 40 Cal.3d 512, 541 [220 Cal.Rptr. 637, 709 P.2d 440] (*Brown I*).)

Defendant next argues that the instructions, coupled with the trial judge's responses to the jury inquiry, constituted a directed verdict for death, or at least a presumption favoring death. ■ While a mandatory death penalty scheme is unconstitutional because it fails to permit consideration of the accused's unique circumstances (*Sumner v. Shuman* (1987) 483 U.S. 66 [97 L.Ed.2d 56, 107 S.Ct. 2716]; *Woodson v. North Carolina* (1976) 428 U.S. 280, 303-305 [49 L.Ed.2d 944, 960-962, 96 S.Ct. 2978] [plur. opn.]; *Brown I, supra,* 40 Cal.3d at p. 539), instructing the jury it must accept the existence of a previously found special-circumstance finding neither constitutes a mandatory death sentence nor imposes a presumption in favor of the death penalty.

The instructions and argument made clear that a sentence of life imprisonment without the possibility of parole was a permissible alternative and that the jury must decide the case based on all the factors. As the court explained in response to the jury's inquiry, "[i]n fact, unless special circumstances or a special circumstance exist in any first degree murder case, *the death penalty is not even an option, . . .*" (Italics added.) It was "because there has been a special circumstance already found to be true that you as a jury then *are being asked to decide what the penalty should be,* that is, death or life in prison without possibility of parole . . . ." (Italics added.) The jury cannot have been misled.

Finally, defendant claims the admonition to accept the judgment of the guilt phase jury regarding the existence of the multiple-murder special circumstance impermissibly invited the penalty jury to shift the onus of decisionmaking to the prior jury in violation of *Caldwell v. Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633]. However, merely informing the jury to accept the *existence* of the special circumstance finding did not require the jury to give that finding any particular weight. Indeed, the jury

was carefully instructed to consider all the evidence and arguments of counsel.[8]

In sum, we find no impropriety in instructing the jury pursuant to factor (a) or in responding to the jury's inquiry.

E. *Failure to define first degree murder for the jury.*

Soon after the trial court responded to the jury's inquiry regarding the meaning of the term "special circumstance," the jury requested the judge define the term "first degree murder." After having the jurors returned to the courtroom, the trial judge opined that the jury "is asking for the legal definition of first degree murder. I am not going to give that to you in that it is not really for you to decide whether this is first degree murder or not. It is and it has been so found, and you are just to accept that as a fact and proceed from there. As far as the facts of the event, you have heard that and that's before you, and you are to make your decision based upon all the evidence presented at the trial."

After further deliberations, the jury sent the judge another note, stating "We need a specific definition of what first degree murder is." Conferring with the prosecutor and defense counsel, the trial judge admitted he did not understand the message but was ready to provide the jury with the appropriate definitions. The prosecutor had no objection, but defense counsel vigorously opposed any additional murder instructions.

After argument, the trial court decided to write the jury a note which said: "You must accept as an established fact that defendant is guilty of first degree murder. As far as penalty is concerned, you have all of the instructions upon which you are to determine whether it is to be death or life in prison without the possibility of parole. I cannot instruct you further on this subject." The jury continued its deliberation and at one point asked to rehear Laufenberger's testimony. However, the jury did not indicate it

---

[8] Defendant also argues that the "conclusive" prior special-circumstance finding was not a permissible aggravating factor at the penalty retrial because the *prior* jury was instructed to act "regardless of the . . . consequences" of its verdict (see CALJIC No. 1.00), and not to consider the possible penalty. Accordingly, defendant asserts, the death judgment improperly rests on a "determination by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the . . . sentence is elsewhere." (*Caldwell, supra,* 472 U.S. at pp. 328-329 [86 L.Ed.2d at p. 239].) However, the prior jury was not defendant's "sentencer"; by finding the multiple-murder special circumstance, it merely resolved a factual issue which rendered defendant *eligible* for the death penalty. The normative function of deciding *which penalty should actually be imposed* was entirely in the second jury's hands. As noted, the latter jury must have understood its power and duty to weigh the multiple-murder issue by its own standards and to choose the appropriate punishment. No *Caldwell* violation occurred.

could not reach a verdict without the definition of first degree murder. It made no further request for that definition. Two days after its last inquiry on the subject, the jury announced it had reached a verdict.

■ Defendant contends a penalty reversal is required because of the trial court's erroneous failure to define first degree murder for the jury. Of course, the trial court bears the responsibility of instructing the jury on all the general principles of law raised by the evidence which are necessary for the jury's proper understanding of the case. (*Wickersham, supra,* 32 Cal.3d at p. 323.) Moreover, "[a]fter the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, . . . the information required must be given . . . ." (§ 1138; see also *People* v. *Miller* (1981) 120 Cal.App.3d 233, 236 [174 Cal.Rptr. 479].) Defendant argues the jury's two inquiries "demonstrated that it did not understand the very basic legal definitions and principles which governed the penalty phase deliberations."

Defendant's claim must be rejected for two reasons. First, his trial counsel invited any error by explicitly opposing first degree murder instructions in response to the jury's request. The record indicates counsel did not act from ignorance or mistake, but for specific tactical reasons. (*People* v. *Avalos* (1984) 37 Cal.3d 216, 228-229 [207 Cal.Rptr. 549, 689 P.2d 121]; *Wickersham, supra,* 32 Cal.3d at pp. 330-335.) He feared that if the penalty jurors were reminded of the mental states necessary for first degree murder findings, his penalty phase argument that defendant acted in response to paranoid hallucinations would be undermined.

The guilt jury was instructed on both premeditation and robbery-murder theories of first degree murder. The general verdict did not indicate which theory of conviction was chosen, but the evidence for either was adequate. (*Murtishaw I,* 29 Cal.3d at pp. 749-752.) Thus, the guilt jury validly found that defendant killed with unlawful intent and premeditation, or in the course of a crime—robbery—requiring the specific intent to steal, or both. (*Ibid.*)

Court and counsel were well aware of this fact while discussing the appropriate response to the penalty jury's inquiry.[9] In that context, defense

---

[9] Early in the discussion, the following colloquy occurred: "[¶] MR. COOK [defense counsel]: I think the Supreme Court was somewhat equivocal about whether or not it was felony murder. [¶] THE COURT: Which it was, this was—[¶] MR. COOK: And I wouldn't want that—[¶] THE COURT: —premeditated with malice aforethought or murder in the course of robbery, and as I indicated they indicated it could be either, and therefore they didn't have to decide. [¶] MR. COOK: Yeah. [¶] THE COURT: We don't know what the prior jury found because it was a general verdict of guilty. . . ."

counsel argued vigorously that the penalty jury should not be allowed to go back and "second-guess" the issue of defendant's guilt. As counsel explained, "Actually we are getting into the guilt phase, *and then they have to make a determination as to whether or not there was in fact premeditation, deliberation, malice of forethought [sic] intent to kill, whether there was an intent to rob,* these kinds of things, which are totally foreign, I think, to the penalty phase, and we should not get into this. . . ." (Italics added.)

Later in the discussion, the court noted that the sentencing factor of "extreme" mental disturbance (§ 190.3, factor (d); former § 190.3, factor (c)), on which the instant jury had been instructed, was related to some of the "mental" elements in first degree murder instructions, such as "intent, malice, premeditation, self-defense, and so forth. So it seems to me I should not reinstruct them on first degree murder because they have already been instructed on the relevant parts."

The following colloquy then occurred: "[¶] MR. LEDDY [the prosecutor]: I don't know. Defense counsel put a lot of witnesses on that said the defendant couldn't deliberate, premeditate, et cetera, and—[¶] MR. COOK [defense counsel]: I didn't say that in my argument, if that's—[¶] Q [apparently by Mr. Leddy]: But you did put witnesses on who were asked that question. [¶] MR. COOK: Well, I don't think—that's not an issue here. *The fact is they were instructed as to mitigation and aggravation, and the definition of first degree murder and the elements of first degree murder are not a part of the factors in aggravation and mitigation. It's not a part of the penalty, phase,* and to do so I think would—[¶] THE COURT: I agree. I think that anything—[¶] MR. COOK: —cause a real problem." (Italics added.)

It seems manifest that counsel wished to prevent the second penalty jury from learning that previously found elements of first degree murder were inconsistent with the mitigating factors counsel sought to establish. As noted, defendant's penalty case centered on the premise that he had acted from temporary mental derangement. The jury's understanding that the prior convictions implied a contrary finding might well have prejudiced his case. We are therefore satisfied that counsel opposed first degree murder instructions for plausible tactical reasons. Any error in their omission was thus invited, and defendant may not complain now.

In any event, the trial court acted properly by declining to define first degree murder. The meaning of first degree murder was not a general principle of law necessary to the jury's proper understanding of the case. (*Wickersham, supra,* 32 Cal.3d at p. 323.) The only relevance of the guilt phase evidence was whether the jury might find factors in aggravation or

mitigation from the circumstances of the crime. Since the jury was informed of such circumstances, we find no error in failing to instruct on first degree murder.

Indeed, we had held under earlier death penalty statutes that such instructions were not required, despite our recognition that those laws provided no express penalty standards and allowed the sentencer to consider "any fact" in aggravation or mitigation, including lingering doubts about defendant's guilt. (*People v. Terry* (1969) 70 Cal.2d 410, 419-420 [77 Cal.Rptr. 460, 454 P.2d 36]; *People v. Polk* (1965) 63 Cal.2d 443, 451 [47 Cal.Rptr. 1, 406 P.2d 641]; *People v. Clark* (1965) 62 Cal.2d 870, 887-888 [44 Cal.Rptr. 784, 402 P.2d 856].) No different result is required under the 1977 statute, which provides more specific guidelines for exercise of the jury's penalty discretion.

Defendant cites cases from California and other jurisdictions which he claims lead to a different result. All are inapposite, since they involve situations where the jury's request for clarifying instructions was pertinent to an issue the jury was directly required to decide. (E.g., *Miller, supra,* 120 Cal.App.3d 233 [defendant charged with assault causing great bodily injury; jury asked for clarifying instructions on meaning of term "great bodily injury"]; *People v. Vela* (1985) 172 Cal.App.3d 237 [218 Cal.Rptr. 161] [trial court incorrectly answered, then refused to re-answer, rape jury's requested clarification whether rape legally occurs when, after consensual penetration, woman changes mind but man continues with act of intercourse]; *State v. Couch* (Utah 1981) 635 P.2d 89 [sodomy prosecution; jury requested definition of "genitals"]; *People v. Miller* (1959) 6 N.Y.2d 152 [188 N.Y.S.2d 534, 160 N.E.2d 74] [homicide case; refusal to reinstruct on felony murder]; *Commonwealth v. Smith* (1908) 221 Pa. 552 [70 A. 850] [homicide case; refusal to reinstruct on premeditation].)

■ Defendant also claims section 1138 requires reversal. As stated above, section 1138 requires the trial court to instruct the jury, at its request, "on any point of law arising in the case." Although defendant asserts the legal definition of first degree murder is "eminently qualified" as a point of law "arising in the case," we disagree. Defendant's guilt of that crime having already been established, the jury need only know the circumstances of the crime in order to assist it in deciding on the appropriate penalty.

Defendant cites four cases allegedly supporting his interpretation of section 1138, but they are not controlling inasmuch as none concern the trial court's duty to give clarifying instructions. Instead, all four involve the trial court's failure to have testimony reread to the jury. (*People v. Henderson* (1935) 4 Cal.2d 188 [48 P.2d 17]; *People v. Litteral* (1978) 79 Cal.App.3d

790 [145 Cal.Rptr. 186]; *People* v. *Butler* (1975) 47 Cal.App.3d 273 [120 Cal.Rptr. 647]; *People* v. *York* (1969) 272 Cal.App.2d 463 [77 Cal.Rptr. 441].) Of course, any testimony given at trial may be pertinent to the jury's decision. Since the definition of first degree murder was not a point of law "arising in the case," it follows there was no violation of section 1138.

F. *Erroneous penalty instructions under 1978 law.*

In April 1978, when defendant's crimes occurred, the death penalty statute passed by the Legislature in 1977 (the 1977 law) was still in effect. (Stats. 1977, ch. 316, §§ 1-26, pp. 1255-1266.) The Briggs death penalty initiative (the 1978 law) became effective thereafter, on November 8, 1978. As we noted in *Easley, supra,* 34 Cal.3d 858, the 1978 law contains sentencing language different from the 1977 version and is prospective only. (34 Cal.3d at p. 883.) ■ Defendant correctly observes that, under *Easley,* the trial court therefore erred when it delivered sentencing instructions modeled on the 1978 law, rather than its 1977 counterpart. (*Id.*, at p. 881; see CALJIC Nos. 8.84.1, 8.84.2 (1979 rev.).)

Defendant urges that this was "fundamental" error requiring reversal, because his trial and sentence under the harsher 1978 law violated his rights under the ex post facto clause. He further contends the erroneous 1978-law instructions were manifestly "less favorable" to him in explaining to the jury the scope of its sentencing responsibility, creating an unacceptable danger the jury was misled.

We cannot agree. The 1978 law, as interpreted by this court since *Easley,* does not operate less favorably to him than the 1977 version. Moreover, there appears no reasonable possibility the 1978-law instructions misled this jury about the relevant mitigating evidence or the nature of its sentencing responsibilities under the 1977 law. We therefore find no constitutional violation and no basis for reversal.

The 1977 law enumerated 10 sentencing factors, then provided that "the trier of fact shall *consider, take into account and be guided by* the aggravating and mitigating circumstances referred to in this section, and shall *determine* whether the penalty shall be death or life imprisonment without the possibility of parole." (Former § 190.3, italics added.) The 1978 law also provides that "the trier of fact shall consider, take into account, and be guided by" similar enumerated factors. However, the 1978 language states that the fact finder "shall" then impose a death sentence if it concludes aggravating circumstances "outweigh" mitigating, and "shall" impose a sentence of life imprisonment without possibility of parole if it concludes mitigating circumstances "outweigh" aggravating. (§ 190.3.)

As defendant points out, we found reversible error in *Easley, supra,* when 1978-law instructions were given by mistake in a 1977-law trial. In that relatively early case, we reasoned that the two *laws* were prejudicially dissimilar, in that the 1977 statute, unlike its 1978 successor, allowed the jury to decide death was inappropriate and grant mercy even if aggravation outweighed mitigation. (34 Cal.3d at pp. 883-884.)

However, we have since made clear that the 1978 statute provides a range of sentencing discretion no less favorable to a defendant than its 1977 counterpart. *Easley* itself minimized any distinction between the "consideration" of sentencing factors described in the 1977 law and the "weighing" of factors required by the 1978 law. "[I]n that respect," the *Easley* majority reasoned, "there may well be no significant difference between the two provisions. . . ." (34 Cal.3d at p. 884, fn. 19.)

Rather, *Easley* suggested that the statutes diverged only after the jury had "considered" or "weighed" the factors. Under *Easley's* construction, the 1978 law's "weighing" process dictated the penalty, while a 1977-law jury could spare the defendant's life regardless of its view of the aggravation-mitigation balance. (34 Cal.3d at p. 884, fn. 19.) But even this distinction was questionable, the *Easley* majority implied, since "[t]heoretically, if a jury were to interpret the 1978 law to mean that aggravating factors 'outweigh' mitigating factors only when it believes that death is the appropriate sentence, the 1978 and 1977 provisions would be essentially indistinguishable. . . ." (*Id.,* at p. 882, fn. 15.)

In *Boyd, supra,* 38 Cal.3d 762, we again suggested a "crucial difference" in the sentencing processes required by the two statutes. But the distinction stressed in *Boyd* is not helpful to defendant's claim here. We there reasoned that the 1977 law, by presenting the various sentencing factors only as "guidance" in the penalty determination, impliedly left the sentencer free to consider "any other [i.e., nonstatutory] matter it deemed relevant" in aggravation of penalty. (See also *Murtishaw I, supra,* 29 Cal.3d at pp. 777-778.) By contrast, *Boyd* proposed, the 1978 law, by requiring the sentencer "to decide the *appropriateness* of the death penalty *by a process of weighing* the specific factors listed in the statute, . . . necessarily implied that [aggravating] matters not within the statutory list" are irrelevant and may not be considered. (38 Cal.3d at p. 773, italics added.)[10] In this respect, therefore, the 1978 law is more favorable to a capital penalty defendant than its predecessor.[11]

---

[10] As *Boyd* noted, the drafters of the change "may very well have believed it was essential [under then-current United States Supreme Court cases] to limit the discretion of the jury *to a consideration of the specific factors listed in the statute.*" (*Id.,* fn. 5, italics added.)

[11] The sentencing factors enumerated in the two statutes are identical with one exception. (But see fn. 14, *post.*) Moreover, under both statutes, the federal Constitution requires the

Finally, in *Brown I,* 40 Cal.3d 512, we confronted a claim that the 1978 law was unconstitutional because, in certain circumstances, it imposed a "mandatory" death sentence. We disagreed and upheld the statute, rejecting any notion—such as that suggested in *Easley*—that the 1978 law (unlike the 1977 version) substitutes a mechanical and arbitrary process for the sentencer's normative discretion in deciding the appropriate penalty.

In *Brown I,* we conceded that a death penalty statute "would [not] pass [constitutional] muster if it required jurors to render a death verdict on the basis of some arithmetical formula, or if it forced them to impose death on any basis other than their own judgment that such a verdict was appropriate under all the facts and circumstances of the individual case. [Fn. omitted.]" (40 Cal.3d at p. 540.) Construing the 1978 initiative to avoid such constitutional problems, we explained that "the statute should not be understood to require any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that *death is the appropriate penalty under all the circumstances.* Thus the jury, *by weighing the various factors,* simply determines under the relevant evidence which penalty is *appropriate* in the particular case. [Fn. omitted.]" (P. 541, italics added.)

A 1978-law jury may not approach this task arbitrarily or mechanically. Rather, each juror must assign "whatever moral or sympathetic value he deems appropriate" to the relevant sentencing factors, singly and in combination. He must believe aggravation is so relatively great, and mitigation so comparatively minor, that the defendant deserves death rather than society's next most serious punishment, life in prison without parole. (40 Cal.3d at pp. 540-542, & fn. 13, 545, fn. 19.)

This analysis leaves a 1978-law sentencer with the same range of potential mitigating evidence and the same broad power of leniency and mercy afforded a 1977-law jury. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 779 [230 Cal.Rptr. 667, 726 P.2d 113].) Indeed, the majority in *Brown I* expressly noted that its analysis left only one essential distinction between the 1977 and 1978 schemes: the limitation on relevant aggravating evidence under the *1978* law. (40 Cal.3d at p. 544.) Thus, we may easily reject defendant's ex post facto claim. He was not tried and sentenced under a less favorable *law* than that in effect when he committed the murders.[12]

---

sentencer to consider, as mitigating factors in addition to those listed, " 'any . . . "aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death." ' " (*Brown I, supra,* 40 Cal.3d at p. 541; *Easley, supra,* 34 Cal.3d at pp. 877-878, & fn. 10; *People* v. *Frierson* (1979) 25 Cal.3d 142, 178 [158 Cal.Rptr. 281, 599 P.2d 587]; see *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869]; *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954] [plur. opn.].)

[12] Justice Broussard claims the foregoing analysis creates a "dilemma" about which we "equivocate." On the one hand, he suggests, if we find the two statutes functionally similar,

 Defendant nonetheless contends there was reversible prejudice, since the 1978-law *instructions* erroneously given in his case were more "confusing" and "burdensome" on the issue of sentencing discretion than the 1977-law instructions to which he was entitled. In *Brown I,* we acknowledged there was "room for some confusion" when a *1978-law* jury is instructed in that statute's "shall/outweigh" language without further explanation. We directed that additional explanatory instructions be given in future trials under the 1978 law. We refrained from holding that the omission of explanatory instructions in pre-*Brown* 1978-law trials was "error." Nonetheless, we stated we would examine each such case on its merits to determine whether, under all the particular circumstances, "the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (40 Cal.3d at p. 544, fn. 17.)

We have since applied this case-by-case test to a number of pre-*Brown* 1978-law trials. In each instance, we closely examine the instructions in the context of counsels' arguments to determine whether reasonable jurors might have received a mistaken view of their responsibilities. (E.g., *People* v. *Babbitt* (1988) 45 Cal.3d 660, 713-715 [248 Cal.Rptr. 69, 755 P.2d 253]; *People* v. *Williams* (1988) 44 Cal.3d 1127, 1148-1149 [245 Cal.Rptr. 635, 751 P.2d 901]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 103-104 [241 Cal.Rptr. 594, 744 P.2d 1127]; *Allen, supra,* 42 Cal.3d at pp. 1276-1280.)

The fact that it was technical "error" to give 1978-law instructions in this *1977-law* case does not compel a different approach. Trial error, including "misdirection of the jury," is not reversible unless it actually produced a "miscarriage of justice." (Cal. Const., art. VI, § 13.) We scrutinize the penalty phase of capital trials with considerable care, but even plain error must be deemed harmless when there is no reasonable possibility it affected the penalty verdict. (*People* v. *Brown* (1988) 46 Cal.3d 432, 447-449 [250 Cal.Rptr. 604, 758 P.2d 1135].) If the sentencer's discretion under the 1978 *law,* properly construed, is essentially the same as under the 1977 *law,* it is no more inherently "confusing" or "prejudicial" to give 1978-law sentenc-

---

we must concede that the 1978 law, like the 1977, allows the penalty jury to *disregard* the aggravation-mitigation balance when deciding the appropriate penalty. On the other hand, he posits, if we are unwilling to acknowledge such latitude in a 1978-law penalty determination, then we must admit the two statutes are prejudicially dissimilar. (*Post,* at p. 1038.) As in other cases, Justice Broussard misreads the nature of the sentencing process under both statutes. We have consistently explained under the 1978 law that the "weighing" of the pertinent factors *is the process* by which the sentencer performs the guided, but normative and subjective, task of deciding for itself what penalty is "appropriate" for the particular offense and offender. (E.g., *People* v. *Adcox* (1988) 47 Cal.3d 207, 267 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Wade* (1988) 44 Cal.3d 975, 999 [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1277 [232 Cal.Rptr. 849, 729 P.2d 115]; *Brown I, supra,* 40 Cal.3d at p. 541; see also *Boyd, supra,* 38 Cal.3d at p. 773.) Though a 1977-law sentencer may have more latitude with respect to aggravating evidence (see discussion, *ante*), its responsibility for deciding the proper punishment is essentially the same.

ing *instructions* in a 1977-law case than in a 1978-law case. The analysis whether the jury may have been misled must be the same in both instances.

Defendant emphasizes our suggestion in *Brown I* that even if *Easley* had exaggerated differences between the two *statutes,* the *Easley* result was supportable because "the 1978 *instruction* given [in that case] was prejudicial when compared to its 1977 counterpart . . . ." (40 Cal.3d at p. 544, fn. 16, italics in original.) This dictum, made without extensive analysis, was intended only to suggest that we could find the 1978 law similar to the 1977 version, and thus constitutional, without calling into question the penalty reversal in *Easley.* [13]

In *Brown I,* this court clearly disapproved *Easley*'s assumption that the two laws offer substantially disparate sentencing discretion. We have since made clear that confusion between 1978- and 1977-law instructions does not warrant reversal where it is clear any prejudice was not substantial. (*Rodriguez, supra,* 42 Cal.3d at pp. 783-784; see also *People* v. *Phillips* (1985) 41 Cal.3d 29, 59-60 [222 Cal.Rptr. 127, 711 P.2d 423].) Since any potential ambiguities in the 1978-law instructions do not necessarily warrant reversal in a 1978-law case, we now find no logical basis for the notion that the giving of 1978-law instructions in a 1977-law case is inherently reversible. To the extent *Brown I* and *Easley* suggested otherwise, we must retreat from their implications.[14]

Defendant invokes the rule that "equivocal" instructions on a basic issue require reversal in a criminal case, especially where it is impossible to tell if the verdict rests on a constitutionally infirm interpretation of the instructions. (Citing, e.g., *Yates* v. *United States* (1957) 354 U.S. 298, 312 [1 L.Ed.2d 1356, 1371-1372, 77 S.Ct. 1064]; *Bollenbach* v. *United States* (1946) 326 U.S. 607, 613 [90 L.Ed. 350, 354-355, 66 S.Ct. 402]; *Stromberg*

---

[13] Ironically, *Easley*'s result required no such protection, nor does it now. Nothing in *Brown I* or our discussion here could alter the *Easley* reversal, which was "additional[ly] and independent[ly]" based on the trial court's giving of an "antisympathy" instruction combined with its failure to explain the jury's power and duty to consider all proffered mitigating character and background evidence. (34 Cal.3d at pp. 875-881.)

[14] Defendant suggests the 1977 law favored him because, by logical application of *Boyd, supra,* it allowed *unlimited mitigating* as well as aggravating evidence. Thus, he suggests, the 1977 law, unlike its 1978 counterpart, permitted the jury to consider such factors as the effect of his execution on his family and friends. However, evidence of this kind is typically presented and considered under the "character and background" category of both statutes. In any event, the 1977-law *instructions* in use at the time of his trial were no more helpful on the issue than the 1978-law instructions actually given. Hence, he suffered no comparative instructional prejudice. Nor need we be concerned that the 1978-law instructions, unlike those under the 1977 law, direct the sentencer to consider prior nonviolent felony convictions as aggravating factors. (§ 190.3, factor (c); see CALJIC No. 8.84.1, factor (c).) No such convictions were presented at defendant's penalty retrial. (See also discussion, *post.*) Defense counsel, calling attention to the upcoming instruction, argued that the absence of prior felonies was an important factor in defendant's favor.

v. *California* (1931) 283 U.S. 359, 368 [75 L.Ed. 1117, 1122-1123, 51 S.Ct. 532, 73 A.L.R. 1484].) In particular, he urges that instructions in the bare "shall/outweigh" language of the 1978 statute violate the Eighth Amendment because they may mislead a reasonable jury about the scope of its constitutional capital sentencing authority.

As *Brown I* and its progeny suggest, however, the 1978-law instructions are potentially confusing only in particular circumstances. We must therefore uphold the judgment if satisfied from the individual facts that a reasonable jury could not have been led astray. (See also *California* v. *Brown, supra,* 479 U.S. at pp. 545-546 [93 L.Ed.2d at pp. 942-943] [conc. opn. of O'Connor, J.]; *People* v. *Brown* (1988) 45 Cal.3d 1247, 1256-1258 [248 Cal.Rptr. 817, 756 P.2d 204].)

We conclude the instant jury cannot have have been misled about the scope of its sentencing responsibility. As noted, the jury received no instructions beyond the bare language of the 1978 statute. However, both counsel's arguments made clear that the jury was to weigh the various sentencing factors as it chose and must ultimately decide for itself which penalty defendant deserved under all the circumstances. (See *People* v. *Myers* (1987) 43 Cal.3d 250, 274-275 [233 Cal.Rptr. 264, 729 P.2d 698]; *Allen, supra,* 42 Cal.3d at pp. 1276-1277.)

The bulk of both arguments was devoted to discussing the circumstances of the capital crime (§ 190.3, factor (a); see also former § 190.3, factor (a)) and attacking opposing expert witnesses. Defense counsel asserted that the desert homicides arose from a short-lived psychomotor seizure. The seizure, counsel argued, was caused by organic brain damage, dehydration, alcohol intoxication, and a PCP-induced "flashback" during which defendant believed the student filmmakers were shooting at him. The prosecutor maintained that defendant, perhaps fortified by alcohol, had committed three brutal, premeditated murders. In the prosecutor's view, defendant acted out of frustration over his life and the day's events, a need for ego gratification, and a desire to steal the victims' car without leaving witnesses.

At the outset, the prosecutor told the penalty jurors that "you are now in the position of a judge who is going to decide is this defendant—are the crimes sufficiently aggravating to justify the death penalty . . . ." The prosecutor stressed that each juror bore personal responsibility for applying his own "weigh[ing]" system to the evidence. As the prosecutor noted, "*somehow* you have to decide what kind of weight you are going to give to the lives of these four people against any of the mitigating factors which you believe. . . . [¶] . . . Now, I don't want, if you do it individually, it's up to you, or whether you decide on a number, how you decided, that's up to you. Somehow to say how much weight am I going to give to [each victim and

the way he or she was killed]. Now that's a very serious and heavy obligation, . . . ." (Italics added.)

At this stage, the prosecutor did make brief reference to a "scale" on which he had organized his view of the aggravating and mitigating factors. However, he had previously admonished the jury that his argument was merely comment on the evidence, and was not itself evidence; now he cautioned that "this scale is obviously editorial comment, and is [merely] a comment on the state of the evidence."

The prosecutor returned to his "balance of justice" theme at the conclusion of his argument. He urged that defendant's relative youth and prior nonviolence were entitled to little weight against the viciousness of the murders. Personal problems, he suggested, do not excuse homicide. The prosecutor emphasized that nobody forced defendant to abuse drugs and alcohol, make poor decisions in his personal life, and get into trouble at work. The jurors, said the prosecutor, must "send [the] message" that we are responsible for our own lives.

Indeed, the prosecutor suggested, there was another reason why defendant's personal difficulties should not be deemed mitigating; were defendant imprisoned rather than executed, he would live in security, free of his domestic and employment problems. This, the prosecutor asserted, was not an "honest balance" for defendant's crimes. The prosecutor concluded by stating that "[w]hat we ask from you, ladies and gentlemen, is just what the symbol of justice shows: holding the scale, balancing the justice."

Without objection, defense counsel further stressed the jury's broad power and duty. He emphasized that the mere fact of the crimes did not require death; otherwise, there would be no penalty trial. Counsel pointed out that defendant's youth, and his lack of prior violence or felonies, were important mitigating factors. He reminded the jurors they could consider their observations of defendant and the testimony of his relatives. Counsel conceded that defendant's crimes could not be excused but argued that defendant had "redeeming qualities" and begged the jury not to "kill him." Counsel offered a detailed description of the torments of life imprisonment—"unbelievably a severe punishment"—and urged that it was not "soft" to reject death. In conclusion, counsel declared that he had long carried the "heavy burden" of defendant's life but was now transferring that burden to the jury.

Under these circumstances, the jurors must reasonably have understood they were to decide, by weighing all the relevant evidence, which of the two available penalties they deemed just and appropriate. This was their obligation under both the 1977 and 1978 death penalty laws. The instructional error thus caused no prejudice warranting reversal.

## G. *Factor (j)-(k).*

■ Defendant also contends the standard instruction based on section 190.3, factor (k) (former § 190.3, factor (j)), which directs the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime," failed to inform the jury it should consider the evidence of defendant's character and background in mitigation. In *Easley, supra,* we recognized this potential ambiguity and directed future trial courts to instruct penalty juries that they may consider any evidence in mitigation the defendant presents. (34 Cal.3d at p. 878, & fn. 10, citing *Lockett, supra,* 438 U.S. at p. 604 [57 L.Ed.2d at p. 990].) Inasmuch as the trial court did not give this "expanded factor (j)-(k)" instruction, defendant claims his jury was misled into believing his character evidence was irrelevant.

In evaluating such arguments, we have taken our cue from the United States Supreme Court's decision in *California* v. *Brown, supra,* 479 U.S. 538. The high court there "stressed the necessity of analyzing the record in each case to determine whether the jury instructions, taken as a whole, and read in conjunction with the prosecutor's arguments, adequately informed the jury of its responsibility to consider all of the mitigating evidence in the case. [Citations.]" (*Ghent, supra,* 43 Cal.3d at p. 777.)

Initially, no supplemental ameliorative jury instructions were given in this case. However, after refusing the jury's request for a definition of first degree murder, the court commented: "As far as the facts of the event, you have heard all that and that's before you, and you are to make your decision *based upon all the evidence presented at the trial.*" (Italics added.) This supplemental instruction arguably directed the jury to consider defendant's character evidence. (See *People* v. *Kimble* (1988) 44 Cal.3d 480, 510 [244 Cal.Rptr. 148, 749 P.2d 803].)

In addition, the prosecutor's closing argument clearly implied the evidence of defendant's background and history should be considered. The thesis of the prosecutor's argument was that these considerations did not outweigh the factors in aggravation. For example, the prosecutor spent much of his argument pointing out that defendant's PCP intoxication defense was unbelievable. He then averred, "I acknowledge some little impairment. How do you weigh that against the lives of three people?" Later the prosecutor asked, "How many points do you give him for being young? How many points can you give him for a non-violent life? How many points can you give him for not being caught before when he was only nineteen or twenty? How can you weigh that against the willful and deliberate killing of three people?" It is obvious the prosecutor assumed the jury could consider defendant's background and character evidence, whether or not it related

directly to the seriousness of the capital crime, but that the evidence simply was insufficient to justify mercy in this case.

We thus conclude the jury was not misled by the trial court's failure to deliver an expanded factor (j)-(k) instruction.

### H. *Extreme mental or emotional disturbance.*

■ Pursuant to section 190.3, factor (d) (former § 190.3, factor (c)), defendant's jury was instructed that a potential mitigating circumstance was "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance." Defendant now argues this instruction unconstitutionally precluded the jury from considering evidence of mental or emotional disturbance falling short of being "extreme." "[T]he trier of fact in a capital case must be permitted to give independent mitigating weight to any aspect of a defendant's character or background which is relevant to the penalty issue." (*Ghent, supra,* 43 Cal.3d at p. 776, citing *Lockett, supra,* 438 U.S. at p. 608 [57 L.Ed.2d at p. 992].)

As we explained in *Ghent, supra,* however, the jury was adequately informed it could consider such evidence since it was instructed it could consider "[a]ny other circumstance which extenuates the gravity of the crime . . . ." (§ 190.3, factor (k); former § 190.3, factor (j), italics added.) This " 'catchall' provision is sufficient to permit the penalty jury to take into account a mental condition of the defendant which, though perhaps not deemed 'extreme,' nonetheless mitigates the seriousness of the offense." (43 Cal.3d at p. 776.)

Defendant complains that the instructions, read as a whole, are inconsistent and ambiguous because factor (d) (former factor (c)) tells the jury to consider evidence of *extreme* emotional disturbance as a mitigating factor but factor (k) (former factor (j)) invites the jury *also* to consider mental or emotional disturbances which fall short of being extreme. However, we see nothing inconsistent in this interpretation; the statutory scheme lists several mitigating factors but the final one provides a "catchall," thus permitting the defendant to present any mitigating evidence which may be relevant to the jury's decision. It follows this claim lacks merit.

### I. *Character as an aggravating factor.*

During closing argument, defense counsel focused on defendant's childhood and young adulthood, attempting to convince the jury that defendant's personal problems stemmed from his upbringing and justified imposition of a life sentence rather than death. Thus, counsel noted defendant's mother's apparent mental illness, his father's abandonment of the family,

defendant's abuse of several different drugs at an early age, his relationship with his future wife while he was still a teenager, that his wife was emotionally unstable and an alcoholic, his continuing drug abuse as an adult, and his unsatisfying job.

By contrast, the prosecutor argued defendant's background did not warrant leniency. Emphasizing the jury's weighing function, the prosecutor stated, "is it just that this defendant should now be free of those frustrations, free of the wife, free of the job, eating three square meals a day, while these people are moldering in their grave. Is that an honest balance?"

Defendant argues that by these comments, the prosecutor impermissibly transformed mitigating character evidence into aggravating evidence. (Cf. *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861] [misconduct for prosecutor to argue that absence of a mitigating circumstance was aggravating].) However, even assuming the prosecutor's argument was misconduct, any objection was waived by defendant's failure to object where a timely admonition to the jury would have cured any harm. (*Rodriguez, supra,* 42 Cal.3d at p. 788.)

In any event, we see no impropriety. The prosecutor may argue that the *absence* of mitigating factors weighs *against* leniency, so long as he refrains from suggesting that the mere absence of a mitigating factor weighs *in favor of* the death penalty. (E.g., *People* v. *Ruiz* (1988) 44 Cal.3d 589, 620, 622 [244 Cal.Rptr. 200, 749 P.2d 854]; *Ghent, supra,* 43 Cal.3d at p. 775.) Moreover, he may rebut defense efforts to show that defendant's background and character constitute mitigating circumstances. (*Rodriguez, supra,* 42 Cal.3d at p. 791; *Boyd, supra,* 38 Cal.3d at pp. 775-776.) The prosecutor did not overstep those bounds here. No basis for reversal appears.

### J. *Refusal to relieve trial counsel.*

On the eighth day of trial, the prosecutor was cross-examining Dr. Thompson, asking him if he had recently testified in "the Sixto case." Over a defense objection, the prosecutor was permitted to explore this area, raising the possible inference that Dr. Thompson was biased in the defendant's favor since he was paid about $100 an hour and often testified in cases wherein defense counsel Cook was involved, such as "the Sixto case" and the "Delling" case.

The following Saturday, the Bakersfield Californian, apparently the area's largest daily newspaper, revealed that Cook had received a judicial reprimand as counsel in the *Sixto* case. The article stated as follows: Cook represented the defendant in *Sixto,* a capital case before Judge Jelletich. Sixto had already received the death penalty, but the court was waiting for a

promised new-trial motion based on Cook's assertion he had discovered new evidence. On the scheduled hearing date, Cook averred he was unable to proceed because he had been too busy preparing for the trial in the instant case to complete Sixto's new-trial motion. This led to some blistering remarks by both the prosecutor and Judge Jelletich.[15]

■ The following Monday, Cook moved to be relieved as defendant's counsel. He argued that since the jury was only admonished not to read anything concerning defendant's trial, there was a good chance the jurors were exposed to either the newspaper article or television news accounts of the *Sixto* incident. Cook argued the article was not entirely accurate and in any case was prejudicial because it could have diminished his credibility with the jury and thus his effectiveness as defendant's advocate. The trial court denied the motion and admonished the jury not to consider the article.

Defendant now contends the trial court prejudicially erred by failing to grant the motion to relieve counsel. "Ordinarily, . . . the determination whether to allow a substitution is . . . within the sound discretion of the trial court. [Citations.]" (*People* v. *McKenzie* (1983) 34 Cal.3d 616, 629 [194 Cal.Rptr. 462, 668 P.2d 769].) Contrary to defendant's claim, the record fails to reveal the trial court abused its discretion.

---

[15]The article related that "[Judge] Jelletich said he was left helpless by Cook's refusal to proceed with the motion for a new trial. [¶] Had he proceeded without Cook's cooperation, Jelletich said, the California Supreme Court would overturn whichever sentence was imposed. [¶] Although *Cook risked a jail term for contempt of court,* such a jailing could be grounds for appeal in another death penalty case in which Cook is an attorney. [¶] Cook claimed he has been too busy in the case of David Leslie Murtishaw, convicted of three murders and facing a possible death penalty, to prepare for the Sixto case. [¶] Jelletich and an equally angry prosecutor, Clarence Westra, reminded Cook it was he who scheduled Friday's hearing, after previously delaying the sentencing." (Italics added.)

Later, the article stated, " 'I've heard this song and dance from Mr. Cook ever since May 20, 1982,' Westra told Jelletich." Also, "[t]he refusal angered Westra. 'In effect, *Mr. Cook is saying, "Hey, I just don't want to cooperate with the Court.* I don't want to do this today, so let's postpone it." And I don't think the Court has to stand for this *bizarre, obnoxious behavior by Mr. Cook.*' Westra said." (Italics added.)

The article continued: " '*How many times are you going to harass this court, Mr. Cook?*' Jelletich asked. 'You've had a year to try this case. We're ready to go this morning, your witnesses are present and *you're refusing to proceed.*' [¶] 'Yes, your Honor,' Cook said. [¶] '*I believe you're in contempt of court, Mr. Cook,* but I'm not going to get you involved in side issues.' [¶] 'I'm sure our high court would reverse me if I proceeded and denied the motion for a new trial. So I am helpless. *The record will show defense counsel certainly disrupted the court, disrupted the court processes and has not performed with lawyer-like quality.*' [¶] 'You have absolutely no grounds for continuance, but I am forced to grant a continuance,' Jelletich said." (Italics added.) The article closed with a description of how much the county was paying Mr. Cook per day, thus implying that Cook was unnecessarily drawing out the *Sixto* proceedings in order to maximize his fee. The story was also carried by two local television stations on their daily news program.

First, we note the trial court opined that Cook had done an "outstanding" job in representing defendant and that it would probably redound to defendant's detriment to appoint new counsel at such a late stage in the proceedings. In addition, the judge also decided that although the prosecutor's questioning of defendant's experts regarding their participation in the *Sixto* case was proper, he would thereafter prohibit that line of questioning.[16]

In addition, the trial court offered to admonish the jury if Cook so desired. After a recess, Cook agreed and the court made the following statement: "You may or may not recall that on Thursday afternoon during the testimony of Dr. Thompson, reference was made to the—what is known as the Sixto case, and also, I believe, the Delling case. [¶] At this time, I admonish you and direct you, instruct you, to disregard testimony with reference to those particular cases. There are facts of those cases which obviously have nothing to do with the facts that we are trying in this proceeding here.

"Secondly, perhaps more critical, last Saturday of the past weekend, an article appeared in the Bakersfield Californian involving a case is not this case [*sic*]. It involved the case of People versus Sixto, and in that article certain statements were made about defense counsel, in our case, Mr. Cook.

"If you did not read the article, fine. Do not. If you did, . . . I simply want to indicate that as far as I am concerned, both counsel in this case, Mr. Cook and Mr. Leddy, have conducted themselves in a very lawyer-like and businesslike professional manner, and both sides have been very, very well represented in this case." The court closed by reminding the jury of their promise to decide the case based on the evidence introduced in court and not other considerations such as their like or dislike of either attorney.

Finally, in conjunction with defendant's postverdict motion for a new trial, the jurors were individually questioned whether they in fact read the article about the *Sixto* case. Only four jurors said they had read it before deliberating (one said he read it afterwards) and all affirmed that the article played no part in their deliberations. We conclude the trial court properly exercised its discretion in refusing to relieve defense counsel.

### K. *Refusal to exclude witness Buflo from the courtroom.*

 On the fifth day of the trial, defense counsel noted that Lance Buflo, the surviving victim, had been a spectator in the courtroom every day

---

[16]The trial court stated: "Normally it would be proper cross-examination, but this is a rather unique situation. I just think I am correct in using my discretion as an equitable matter not to allow that to be tied in with Sixto."

since his testimony five days earlier. Counsel speculated that Buflo was present at the prosecutor's request for the purpose of improperly influencing the jury and moved to question Buflo. The prosecutor denied asking Buflo to attend the trial and objected to questioning Buflo on the subject, arguing that Buflo had been excused as a witness, that the trial was open to the public, and that there was no exclusion order in effect. The trial court deferred the matter until the next day. Defense counsel did not then renew his motion.

After the jury began deliberating, defense counsel again moved to exclude Buflo from the courtroom, reiterating that Buflo may have been attempting to influence the jury improperly by his presence. Counsel also renewed his motion to question Buflo. The trial court denied both motions, noting that there was no authority to exclude Buflo and that he "has been sitting here quietly, he has not called attention to himself or in any way done anything but sit and observe." Later, when arguing in support of his motion to modify the verdict under former section 190.4, subdivision (e), defense counsel stated he observed the jurors hug Buflo as they left the courtroom. Counsel speculated this behavior demonstrated the verdict was the result of the jury's emotions, not objectivity.

Defendant now argues failure to exclude Buflo requires we reverse the penalty judgment. He cites no authority in support of this claim. Even assuming such authority exists, it is apparent his failure to timely renew his motion after the trial court deferred its ruling constituted a waiver of the claim, at least until it was raised again after the jury had retired. (See *People v. Young* (1985) 175 Cal.App.3d 537, 543 [221 Cal.Rptr. 32] [where witness violates exclusion order by attending defendant's preliminary hearing, defendant must preserve claim by timely moving to exclude or strike witness's testimony]; cf. *People v. Green* (1980) 27 Cal.3d 1, 27, 34 [164 Cal.Rptr. 1, 609 P.2d 468] [necessity to object to prosecutorial misconduct to preserve the issue for appeal].) Accordingly, even if the trial court erroneously denied defendant's second motion, the denial caused no prejudice, since deliberations had already begun.

L. *Enmund finding.*

Defendant concedes, and the evidence is undisputed, that he was the actual killer of the three students. We so find, thus establishing a degree of culpability sufficient under the Eighth Amendment to permit his execution. (*Tison v. Arizona* (1987) 481 U.S. 137, 150 [95 L.Ed.2d 127, 139-140, 107 S.Ct. 1676]; *Cabana v. Bullock* (1986) 474 U.S. 376, 383-388 [88 L.Ed.2d 704, 714-718, 106 S.Ct. 689]; *Enmund v. Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368].)

CONCLUSION

We find no prejudicial error warranting reversal of the verdicts of guilt and death. We therefore affirm the judgment in full.

Lucas, C. J., Panelli, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I join in the dissenting opinion of Justice Arguelles, but write to add some thoughts of my own.

Although defendant was charged under the 1977 death penalty law, the trial court mistakenly instructed the jury under the 1978 law. The majority find no reversible error because, they say, the sentencing provisions of the 1977 and 1978 death penalty laws are essentially identical. Under the 1977 law, the jury could spare defendant's life even if it believed aggravation outweighed mitigation. (See maj. opn., *ante* at p. 1026.) Indeed a 1977-law jury could reach a verdict without determining the aggravation-mitigation balance. The question then arises whether a 1978-law jury also can spare defendant's life even if it believes aggravation outweighs mitigation.

It is a simple question, which could be answered "yes" or "no." The majority equivocate, for it places them in an impossible dilemma.[1] If they answer "no," that a 1978-law jury is bound by its view of the aggravation mitigation balance, then their answer discloses a major difference between the two laws—a difference they do not discuss, and which might require a reversal of the penalty judgment before us. If they answer "yes," their answer calls into question our affirmance of the death penalty in any case in which judge and prosecutor told the jury that if aggravating circumstances outweigh mitigating circumstances, the law requires a death verdict.

The majority cannot escape this dilemma by the "explanation" that under the 1978 law the " 'weighing' of the pertinent factors *is the process* by which the sentencer performs the guided, but normative and subjective, task of deciding for itself what penalty is 'appropriate.' " (*Ante,* p. 1028, fn. 12.)[2]

---

[1] My answer to this question is clear. A 1978-law jury must take into account the balance of aggravation and mitigation, but is not required to return a death verdict simply because it finds that aggravation marginally outweighs mitigation. That matter was settled in *People* v. *Brown* (1985) 40 Cal. 3d 512, 541-542, footnote 13 [220 Cal.Rptr. 637, 709 P.2d 440], where we said that the jury must decide whether aggravation is "so substantial in comparison" with mitigation as to warrant death—language which necessarily implies that a jury could find a preponderance of aggravation insufficient to warrant death. (See also p. 545, fn. 19.) This method of determining penalty is still significantly different from the 1977 law, which did not require the jury even to determine the aggravation-mitigation balance. This difference, and others discussed in the opinion of Justice Arguelles, establish that instructing the present jury under the wrong law was reversible error.

[2] The process of determining penalty under the 1978 law involves three steps: (a) weighing the statutory factors; (b) comparing the weight of the aggravating and mitigating factors; and (c) determining whether aggravation is so substantial in comparison to mitigation that death

The weighing of the factors is *not* the process by which a 1977-law jury determines which penalty is appropriate, so there would still remain a substantial difference between the two laws.[3] This court should not hold that the 1977 and 1978 laws are essentially identical to affirm the death penalty for David Murtishaw under the 1977 law, then insist that 1978-law juries use a significantly different method of determining penalty when it affirms death penalties under the 1978 law.

The majority opinion, moreover, incorrectly analyzes the question of prejudicial error. As the majority note, it is not error to instruct a 1978-law jury in the terms of that statute, but because the instruction is susceptible of misleading analysis we look to the whole record to determine whether the jury was misled. (See *People* v. *Brown, supra,* 40 Cal.3d 512, 544, fn. 17.) It is, however, plain error to instruct a 1977-law jury under the language of the 1978 law. (*People* v. *Easley* (1983) 34 Cal.3d 858, 883 [196 Cal.Rptr. 309, 671 P.2d 813].) Thus, contrary to the majority view, we should not undertake the *Brown* analysis in the present case, but move directly to the question whether there is a reasonable possibility that the error affected the verdict. (See *People* v. *Brown* (1988) 46 Cal.3d 432, 447-449 [250 Cal.Rptr. 604, 758 P.2d 1135].)

Mitigating factors in the present case include the absence of any prior criminal activity, defendant's family history and present marriage, his voluntary surrender before he was a suspect, and the testimony that his acts were the result of prior PCP usage or organic brain damage. A jury could still reasonably find, as this jury presumably did, that the substantial mitigating evidence is outweighed by the single aggravating factor, the circumstances of the crime. But if that same jury were properly instructed under the 1977 law that it could return a life verdict despite the relative weight of the aggravating and mitigating factors—indeed that it could return a verdict without weighing or comparing factors at all—I think it reasonably possible that it would have decided that defendant should be punished by a sentence of life imprisonment without possibility of parole.

is the appropriate penalty. (See fn. 1, *ante,* p. 1038.) The "weighing process" is the method by which the jury decides whether death is the appropriate penalty only if by that process we refer inclusively to all three steps. Regrettably, in cases tried before *People* v. *Brown, supra,* 40 Cal.3d 512, the instructions and argument often omit the final step, and mistakenly assume that the slightest preponderance of aggravation is sufficient to require a death penalty. No such mistake is possible under the 1977 law unless, as in this case, the court instructs under the wrong law.

[3] The majority state that "[t]hough a 1977-law sentencer may have more latitude with respect to aggravating evidence . . . , its responsibility for deciding the proper punishment is essentially the same [as a 1978-law sentencer]." It is true that both have the same responsibility: to determine whether death is the appropriate penalty. But the methods by which they discharge this responsibility are different. A crucial requirement for the 1978-law jury is determining the relative balance of aggravation and mitigation. The 1977 law omits this requirement. The majority's language obscures this difference between the two laws.

**ARGUELLES, J.,** * Dissenting.—I fully agree with the majority's conclusion that the use of the 1978 death penalty law instructions in this case was error since defendant's case is governed by the 1977 death penalty law. (See former Pen. Code, § 190.1 et seq.; Stats. 1977, ch. 316, §§ 7-13, pp. 1257-1262.) However, I disagree with the majority's assessment (*ante,* at p. 1030) that there was no reasonable possibility that the error affected the penalty verdict. Moreover, I believe the majority's equation of "*Brown* error" in a 1978 death penalty law case (*People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440]) with the error in the instant case is analytically incorrect. I therefore dissent.

As the majority explains, the 1978 death penalty law is not a mirror image of its 1977 predecessor. The 1977 law simply instructed the jury to "consider, take into account and be guided by" the statutory aggravating and mitigating factors when deciding on the proper penalty, and did not contain any further language to direct or constrain the jury's choice between a sentence of death and a sentence of life imprisonment without the possibility of parole. By contrast, the 1978 law, in addition to informing the jury to "consider, take into account and be guided by" the statutory factors, goes on to instruct the jury to weigh the various factors and provides that if the aggravating circumstances "outweigh" the mitigating ones, the jury "shall" impose a sentence of death.

· We recognized this difference in *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813]. In that case, as here, the trial judge erroneously used jury instructions based on the 1978 death penalty law in a case governed by the 1977 death penalty law.[1] On appeal, the defendant in *Easley* made a two-pronged argument. First, he argued that reversal was required "because the 1978 provision reduced the latitude which the 1977 law afforded a jury to exercise discretion in favor of a sentence of life imprisonment without possibility of parole." (*Easley, supra,* at p. 882.) Second, he urged that "the 1978 instruction is unconstitutional insofar as it *requires* a jury to return a judgment of death whenever aggravating circumstances 'outweigh' mitigating circumstances, even if the jury does not believe that the 'net' aggravation in a particular case is sufficient to make death the appropriate punishment." (*Ibid.,* italics in original.)

We declined to reach the constitutional question, however, finding it was clearly error to instruct the jury with the provisions of the wrong law.

---

* Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

[1] It is difficult to understand how the trial judge in this case failed to instruct on the applicable law, especially after this court reversed defendant's first penalty judgment. Moreover, some blame must certainly be shared by the prosecutor and defense counsel for failing to alert the trial judge to an error of this magnitude.

Moreover, we found the error prejudicial, stating "we have little doubt that, on balance, the 1978 version is much less favorable to a defendant than the 1977 provision." (*Easley, supra,* 34 Cal.3d at p. 884.) We explained that the 1978 law required the jury to impose the death penalty if the factors in aggravation outweighed those in mitigation. "If it had been properly instructed under the 1977 law, however, the jury would have understood that even if aggravation outweighed mitigation, it was *not required* to impose a death sentence but could exercise mercy and return a verdict of life without possibility of parole. Thus, the erroneous instruction deprived defendant of the opportunity to have the jury exercise the discretion that the 1977 statute provided when aggravation outweighs mitigation." (*Ibid.*, italics in original.)

However, post-*Easley* cases have clarified the proper interpretation of 1978 death penalty law. "By directing that the jury 'shall' impose the death penalty if it finds that aggravating factors 'outweigh' mitigating, the statute should *not* be understood to *require* any juror to vote for the death penalty unless, upon completion of the 'weighing' process, he decides that death is the appropriate penalty under all the circumstances. Thus the jury, by weighing the various factors, simply determines under the relevant evidence which penalty is appropriate in the particular case." (*People* v. *Brown, supra,* 40 Cal.3d 512, 541, fn. omitted, italics added, revd. on another ground *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]]; see also *People* v. *Boyde* (1988) 46 Cal.3d 212, 257-259 [250 Cal.Rptr. 83, 758 P.2d 25], and cases cited [Arguelles, J., conc. and dis.].)

Although I agree with the majority that this portion of the 1978 law, *as construed in Brown, supra,* 40 Cal.3d 512, and its progeny, is functionally equivalent to the 1977 law, it does not follow that jury instructions which track the literal wording of the two laws are interchangeable. In determining whether the pre-*Brown* 1978-law instructions constitute an adequate substitute for the instructions that were legally applicable to defendant's case, the critical question is not what we declare the instruction to mean "but rather what a reasonable juror could have understood the charge as meaning. [Citation.]" (*Francis* v. *Franklin* (1985) 471 U.S. 307, 315-316 [85 L.Ed.2d 344, 354, 105 S.Ct. 1965]; see also *People* v. *Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218].)

As we recognized in *Brown, supra,* 40 Cal.3d 512, the language of the 1978 statute, on which the 1978-law instruction is based, "leave[s] room for some confusion as to the jury's role" and in *Brown,* we accordingly directed that additional, explanatory instructions, clarifying the scope of the jury's discretion, be given in future cases. (*Brown, supra,* at p. 544, fn. 17.) The lesson of *Brown* is that while the 1978 *law,* as interpreted therein, is essentially the equivalent to the 1977 *law, instructions* modeled on the language

of the 1978 law may still work to the defendant's disadvantage because the statute's wording is potentially confusing.

The majority reasons that "[i]f the sentencer's discretion under the 1978 *law*, properly construed, is essentially the same as under the 1977 *law*, it is no more inherently 'confusing' or 'prejudicial' to give 1978-law sentencing instructions in a 1977-law case than in a 1978-law case." (*Ante*, at pp. 1028-1029, italics in original.) This assertion ignores express language in *Brown* itself which reaches a contrary conclusion.

In a significant footnote in *Brown, supra*, 40 Cal.3d 512, we explained that "[i]n *Easley*, this court ruled that it was prejudicial error to give the 1978, or 'mandatory death penalty,' version of CALJIC No. 8.84.2 in a case properly tried under the 1977 law, since a defendant 'is . . . generally worse off under [the mandatory feature of] the *1978 law*.' [Citation.] Our discussion assumed that the 1978 version of section 190.3 intended to require the death penalty in certain cases. No extensive analysis was provided, however, and the statutory interpretation was not necessary to our decision. *Certainly the 1978 instruction given in Easley was prejudicial when compared to its 1977 counterpart, since the latter, unlike the former, contained no unexplained use of mandatory language . . . . Easley itself recognized that, even if statutory language was susceptible to a liberal saving construction, instructions given in the literal statutory language might nonetheless be deficient.* . . . Nothing in *Easley* precludes us from holding that the 1978 *statute* permits the jury to reject death if persuaded by any evidence that it is an inappropriate penalty." (*Brown, supra*, 40 Cal.3d at p. 544, fn. 16, original italics italicized *and* underscored, italics added for emphasis.)

As the above emphasized passage attests, *Brown* disapproved *Easley*'s dictum characterizing the 1978 *statute* as a mandatory death penalty law but carefully reaffirmed the holding of *Easley*, to wit, that giving the 1978 *instructions* in a 1977 case was prejudicial. It was, of course, necessary in *Brown* to disavow *Easley*'s suggestion that the 1978 law was a mandatory one since serious constitutional doubts would be raised by such an interpretation. (See *Sumner* v. *Shuman* (1987) 483 U.S. 66 [97 L.Ed.2d 56, 107 S.Ct. 2716] [striking down Nevada's mandatory death penalty for life prisoners who kill in prison]; *Zant* v. *Stephens* (1983) 462 U.S. 862, 879 [77 L.Ed.2d 235, 251, 103 S.Ct. 2733] [emphasizing the need for an individualized determination of the appropriateness of the death penalty based on the character of the offender and the circumstances of the crime].) Thus, footnote 16 in *Brown* made clear that (1) *Easley*'s characterization of the 1978 *law* as a mandatory one was incorrect, but (2) *Easley* should not be overruled since giving the 1978-law instructions in a 1977 case was itself error and, on the facts of that case, prejudicial. On this latter point, *Brown* is clear and unequivocal: "Certainly the 1978 *instruction* given in *Easley* was

prejudicial when compared to its 1977 counterpart, since the latter, unlike the former, contained no unexplained use of mandatory language." (40 Cal.3d at p. 544, fn. 16, italics in original.)[2] By concluding otherwise, the majority gives no effect to our discussion in *Brown* that specifically preserved that portion of *Easley*.

Inasmuch as *Brown* itself instructs us that giving the 1978-law instruction in a 1977-law case is *error*, the majority's decision to apply the standard "*Brown*-error type" analysis to this case is flawed. In *Brown*, we refrained from holding that giving the standard jury instruction drawn from the actual language of Penal Code section 190.3 was necessarily *error*. Instead, we noted the instruction left "some room for confusion" (*Brown, supra*, 40 Cal.3d at p. 544, fn. 17) and that prior death penalty verdicts rendered without the benefit of ameliorative jury instructions "must be examined on . . . [their] own merits to determine whether, in context, the sentencer may have been *misled* to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." (*Ibid.*, italics added.)

This, however, is not a 1978 case. There can be no dispute but that defendant was entitled to have his jury instructed with the law applicable at the time he committed his crimes. It was thus *clearly error* for the trial court to have used the instructions based on the 1978 law. Merely labelling the error a "technical" one, as does the majority (*ante*, at p. 1028), does not diminish the serious nature of the instructional mistake which occured.

Because there was clearly instructional error in this case, the question whether reversal is required is not the same as in a 1978-law case tried under pre-*Brown* instructions. In a 1978 case involving pre-*Brown* "potentially confusing" instructions, we are presented with an ambiguous instruction and look to the record as a whole to determine whether the jury was *actually misled*. If, after we examine the record, we conclude the jury adequately understood its function, we not only conclude there was no prejudice but that giving the unadorned instruction based on the 1978 statutory language was *not error*. Our examination of the record in such cases generally looks to see if the attorneys' comments during closing argument exacerbated the latent ambiguity in the instructional language, misleading the jury "as to its discretion and its responsibility in reaching its sentencing verdict." (*People* v. *Milner* (1988) 45 Cal.3d 227, 257 [246 Cal.Rptr. 713, 753 P.2d 669].)

---

[2] The majority attempts to diminish this carefully drafted statement in *Brown* by asserting that it is "dictum." However, far from being an unnecessary discourse on the differences between the 1978 and the 1977 death penalty law, this language in footnote 16 in *Brown* is highly important since it harmonized language in *Easley* that conflicted with *Brown*'s conclusion that the 1978 law was not a mandatory one.

By contrast, in a 1977-law case where the 1978-law instructions were erroneously given, *Easley,* as interpreted in *Brown,* teaches us that such a miscue is error and that the error is presumptively prejudicial. In such a case, reversal can be avoided, if at all, only if the record affirmatively reveals that the jury must have understood that the erroneous instructions it was given were identical to the instructions it should have received. Thus, the record must reveal that the jurors were affirmatively made to understand that, despite the apparently mandatory language of the 1978-law instruction, they possessed a degree of discretion coterminous with the discretion granted by the 1977 law. (Cf. *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913] [instructional error was harmless where the factual question posed by the omitted instruction was necessarily resolved against the defendant under other, properly given instructions].)

The record here discloses nothing which affirmatively cured the court's fundamental error in instructing the jury under the wrong law. First, unlike in some cases, the scope of the jury's sentencing discretion was not sufficiently explained in supplemental, ameliorative instructions. (See, e.g., *People* v. *Howard* (1988) 44 Cal.3d 375, 435 [243 Cal.Rptr. 842, 749 P.2d 279] [1978-law case]; *People* v. *Gates* (1987) 43 Cal.3d 1168, 1204-1206 [240 Cal.Rptr. 666, 743 P.2d 301] [1978-law case].) In this 1977-law case, the trial court simply gave the standard 1978-law instructions with no embellishment at all.

Although the majority relies on the closing arguments of the prosecutor and defense counsel to conclude the error was harmless (*ante,* at pp. 1030-1031), such argument cannot render the erroneous instruction of the jury nonprejudicial. The jury was instructed that it was their duty to apply the law as stated by the trial judge and was also instructed that "[s]tatements made by the attorneys during the trial are not evidence." "Jurors are, of course, presumed to follow the instructions given by the court." (*People* v. *Hamilton* (1988) 45 Cal.3d 351, 375 [247 Cal.Rptr. 31, 753 P.2d 1109].) Moreover, the error in this case consisted of misinforming the jury as to the scope of their sentencing discretion. Thus, even assuming for the sake of argument that the closing statements of the prosecutor and defense counsel enunciated a correct version of the jury's discretion, we must assume that, faced with conflicting interpretations of the applicable statute, the jury chose to follow the law as stated by the trial court. Where the jury is given an incorrect instruction, merely giving a correct one as well does not cure the harm since it is impossible for us to know which of the instructions the jury actually followed. (See *People* v. *Rhoden* (1972) 6 Cal.3d 519, 526 [99 Cal.Rptr. 751, 492 P.2d 1143].) This reasoning applies a fortiori, when the

jury must decide between an instruction given by the court and the arguments of the prosecutor and/or defense counsel.[3]

Since this court's decision in *People* v. *Brown, supra,* 40 Cal.3d 512, makes clear that reversal is required under the particular circumstances of this case, I would reverse the penalty judgment and remand for a new penalty trial.

Mosk, J., concurred.

Appellant's petition for a rehearing was denied August 31, 1989. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.

---

[3]Moreover, even assuming arguendo that the closing arguments of the prosecutor and defense counsel could render this type of instructional error harmless, the record in this case fails to demonstrate that either one properly apprised the jury of the scope of its sentencing discretion. Specifically, neither one argued that even if the jury concluded that the aggravating circumstances outweighed the mitigating ones, the jury could nevertheless sentence defendant to life if it concluded that the "net" aggravation was not sufficient to justify the death penalty.