[No. A082782. First Dist., Div. Two. Dec. 9, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
JIMMY WAYNE STANFILL, Defendant and Appellant.

1138

COUNSEL

Maribeth Halloran, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Joan Killeen and Frances Marie Dogan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**LAMBDEN, J.**—Charged with one felony count of embezzlement by a public officer (Pen. Code, § 504; all undesignated references are to that code), Jimmy Wayne Stanfill was tried by a jury that acquitted him of that crime but found him guilty of the misdemeanor equivalent (§§ 504, 514), as a lesser offense. Granted three years' probation conditioned on jail time and his payment of $9,339.05 in restitution, Stanfill appeals claiming misinstruction on the statute of limitations and improper restitution. We will reverse for instructional error.

### BACKGROUND

The trial ran three weeks, involved three dozen witnesses and produced a reporter's transcript topping two thousand two hundred pages. While the parties summarize the testimony in detail, we find the issues adequately framed by a broader overview.

The People showed irregularities in Stanfill's handling of cash and property during his tenure as airport manager for Gnoss Field, Marin County Airport. He had held the job since 1984 and was an employee of the county department of public works (DPW). The prosecution theory was that he began embezzling—keeping cash and obtaining autobody repair tools for his own use—sometime after a wage assignment for child support started in late 1993, reducing his net biweekly salary from $1,144 to between $617 and $944.

Stanfill accepted, insisted on or pressured cash payments from some tenants for hangar rentals, deposits and the like, and he kept cash (up to $1,000) in an envelope in his desk. Cash-paying tenants included Dave Nichols (a good friend of Stanfill's), aircraft mechanic David Upchurch, and Rick Palumbo.

Stanfill also kept airport tools and equipment in places like his home garage and Dave Nichols's hangar. Most of this property was well suited to his personal hobby of autobody repair, and some of it had little or no use in the operation of the airport. Stanfill had general authority to make purchases under $1,000 without prior approval from his supervisor, and such orders

increased through the years 1993 to 1996. At the same time, people he employed to do work around the airport encountered a lack of tools, resistance from Stanfill in purchasing them, and a need to borrow tools from the tenants. This was noted by probationers Stuart Ludlow and Eric Johnson, who as part of an adult offender work program did community service work under Stanfill's supervision, including the construction of a wind direction indicator called the tetrahedron. After the tetrahedron was done, Johnson opened a UPS-delivered air shears, a tool which could have been useful to them except that they had no air compressor.

Ludlow owned a computer and graphic design business, and at Stanfill's request, he submitted a bid in September 1995 for a new computer system for the airport. The bid exceeded $5,000, and after it was approved, Ludlow installed and set it up and provided training for it. Stanfill then asked Ludlow to buy a joystick and to provide a bill for *manuals* instead, since he was going to submit the receipt to the county. Ludlow had reservations about this but did as asked after seeking advice from others. Stanfill used the joystick for games on the computer.

Mike Lockwood was hired by Stanfill as his assistant manager and began work in February 1995. He worked on the tetrahedron project, among other things; noted the lack of tools; saw the cash Stanfill kept on hand ($1,100 in $20 bills); and ultimately, during a vacation Stanfill took to a Wisconsin air show in late July and early August 1996, voiced his suspicions of embezzlement to Stanfill's supervisors at DPW.

Several things sparked those suspicions. Lockwood had known of the cash in the desk, had seen Stanfill use some to pay for pizza, found about $200 missing just before the vacation and then found it entirely gone after Stanfill left. Stanfill had also left him instructions to open an expected shipment of runway lights but not to open boxes from other vendors. Lockwood opened certain deliveries from UPS and saw a chain hoist, a bead roller kit, some hydraulic equipment and small hand tools. He knew Stanfill did auto work and kept automotive parts in a tractor shed and a space between two hangars. He had access to the computer but lost it when the new one was installed because Stanfill kept it locked. Ludlow had also come to Lockwood for advice when Stanfill asked him to falsify the joystick receipt. During the vacation, Lockwood spoke with DPW accountant David Uribe and mentioned the lack of tools; Uribe listed various tools that should have been at the airport (but were not). When a tenant came in during the vacation to generate from the computer a list of other airport tenants for an open house, it turned out that Dave Nichols and Rick Palumbo (two cash payers) were not on the list.

Lockwood met twice with DPW people, who began looking at records during the vacation. Stanfill returned on Monday, August 5th, and was called in for a meeting the next day with his superiors, Mike Sadjadi and Richard Carlsen, the director and assistant director of DPW. Instead of reporting immediately to DPW as directed, he went to his airport office and was seen working there at the computer on some sort of accounting or tenant documentation. Summoned by phone to DPW, Lockwood came with cash in hand —over $1,400 which he said represented cash hangar-rental payments from Nichols for the past year, plus other cash payments. He explained that tools and equipment were at his home because his truck had broken down after he picked them up. Sadjadi placed him on paid administrative leave, and employees were dispatched to pick up what proved to be a truck full of county equipment from Stanfill's home and more at Nichols's hangar (much of it in original packaging). (Nichols's hangar had been searched by the FBI in May 1995 in connection with a drug investigation.)

There followed further investigation and two more interviews of Stanfill by DPW before he was fired, on September 12th. During the interviews, Stanfill gave varying and sometimes inconsistent accounts. In the second interview, for example, he said $450 in cash had been stolen from his desk in a May 1995 "robbery" (never reported) and that he replaced it with his own funds. He also said he kept Nichols's cash separate in case he needed to track it for the FBI investigation.

The DPW investigation continued with inventories, auditing and invoice examinations. Some recently ordered property was returned for refunds. An investigation by the county sheriff produced further interviews with Stanfill and, ultimately, this prosecution.

At trial, the defense painted Lockwood as a drug user who could not treat tools properly, who experienced friction with Stanfill, and who reported him as a defensive move to save his own job. Stanfill testified. He denied all wrongdoing, pointed to lack of regulations for handling county property, and presented character witnesses.

The jury acquitted on the felony charge and returned a verdict of guilty for the misdemeanor lesser offense of embezzling property of a value not exceeding $400. This connoted at least reasonable doubt by all jurors that Stanfill misappropriated any public funds (pt. I, *post*).

In the face of a presentence report recommending restitution exceeding $400, the parties proceeded to a contested restitution hearing. The People presented evidence that an outside audit of the airport records cost the

county $8,000 and had disclosed missing items (not recovered from Stanfill) in an aggregate value of $1,339.05. Over defense argument, the court ruled to impose restitution of both sums.

The court suspended imposition of sentence and placed Stanfill on three years' probation with a four-month jail term, the sentence to become conditional on other terms upon payment of the aggregate $9,339.05 restitution.

## DISCUSSION

### I. *Statute of Limitations*

Stanfill contends that misinstruction on the statute of limitations applicable to the lesser misdemeanor offense of which the jury found him guilty deprived him of his state and federal constitutional rights to a fair trial and due process. The People respond that there was no error or that any error was harmless. This precise issue was evidently overlooked below by both the parties and the court.[1]

### A. *The Instruction*

The statute *was* at issue below but only for the crime as charged, that is, as a felony. Section 504 provides that every county officer or servant (i.e., employee) "who fraudulently appropriates to any use or purpose not in the due and lawful execution of his trust, any property which he has in his possession or under his control by virtue of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, is guilty of embezzlement." Felony or misdemeanor status is not specified there but in section 514, which provides in part: "Every person guilty of embezzlement is punishable in the manner prescribed for theft of property of the value or kind embezzled; . . . if the embezzlement or defalcation is of the public funds of . . . any county . . . within this state, the offense is a felony, and is punishable by imprisonment in the state prison . . . ." The theft provisions at the time of this offense, as relevant here, made felony status dependent on the amount of money or value of property being over $400 (§ 487, subds. (a) and (c)). Thus the charged offense was a felony in two cases, first, if the use value of the property exceeded $400, and second, if the embezzlement was of public funds.

---

[1] In its list of proposed instructions, the defense requested standard CALJIC instructions on petty theft, on lesser offenses and, generally, on the statute of limitations. It is not clear who devised the special instruction ultimately given, for this was evidently done in chambers. Nor do we know whether the statute of limitations was discussed as to the misdemeanor lesser offense, as opposed to the felony as charged. The limitations period had been raised in pretrial motions but only as to the felony.

The amended information charged a felony and included allegations anticipating the three-year statute for crimes "punishable by imprisonment in the state prison" (§ 801). It charged commission of a section 504 offense, "A FELONY," between "AUGUST 6, 1993, and AUGUST 5, 1996," and alleged tolling based on first discovery (§ 803, subd. (c)) being July 19, 1996, when Gnoss Field assistant manager Lockwood advised DPW of his suspicions.

In a single complex instruction, the jury was instructed on the words of section 504, its elements, the distinction between "public funds" and other property, the need for the amount of temporary use to exceed $400 in the latter case, and the need to find "petty theft" if reasonable doubt arose about the value exceeding $400. Twice the instruction alluded to a three-year time limitation. First: ". . . Defendant may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of the acts between the dates of August 6, 1993 and August 5, 1996. You may not find the defendant guilty based on any conduct that occurred before August 6, 1993. However, in order to return a verdict of guilty, all jurors must agree that he committed the same act or acts. . . ." Second: where a temporary use of property "aggregates in excess of $400 in any period of twelve consecutive months between August 6, 1993 and August 5, 1996, the crime is . . . in violation of Penal Code section 504."

The jury's verdict declared Stanfill not guilty of "Section 504"—meaning a felony—"but guilty of a lesser of embezzlement of public property by a county employee with a value of $400 or less, a violation of California Penal Code Section 504." This constituted a verdict for a misdemeanor.

A felony is a crime made "punishable with death or by imprisonment in the state prison," and every other crime or public offense, unless classified as an infraction, "is a misdemeanor . . . ." (§ 17, subd. (a).) Embezzlement is a form of "theft" (§ 490a) and, with exceptions not pertinent here, is made punishable with state prison time only if the use value of the subject property exceeds $400 (§ 487, subd. (a); see also § 514), in which case it is grand theft punishable with state prison time (§ 489, subd. (b)) for a range of sixteen months or two or three years (§ 18). If not a felony (or mere infraction), embezzlement or theft is petty theft (§§ 488, 514), a misdemeanor punishable by up to six months in county jail and a fine of $1,000 (§§ 490, 514).

The statute of limitations for a felony theft offense is generally three years plus any tolling (§§ 801, 803, subd. (c)); the statute of limitations for a misdemeanor, except for offenses not at issue here, is one year (§ 802) and apparently without provision for tolling (§ 803, subd. (c)). The parties

appear to agree that a misdemeanor could have included only those acts preceding by one year the filing of a complaint in municipal court (§ 804, subd. (b)), which occurred here on April 23, 1997. The given instructions, by contrast, allowed jurors to use acts going back to August 6, 1993, nearly two years and eight months earlier.

### B. *Wobbler Status*

■   The People dispute that the offense was in fact a misdemeanor for this purpose. They acknowledge the general rule that "[t]he limitation of time applicable to an offense that is necessarily included within a greater offense is the limitation of time applicable to the lesser included offense, regardless of the limitation of time applicable to the greater offense" (§ 805, subd. (b)), but they contend that embezzlement as defined in sections 504 and 514 is "in effect a wobbler"—or "an alternative felony/misdemeanor"—thus preserving a felony character for limitations purposes.

We disagree. The answer lies in case authority construing section 17, subdivision (b), which provides in part: "When a crime is punishable, in the discretion of the court, by imprisonment in the state prison or by fine or imprisonment in the county jail, it is a misdemeanor for all purposes under the following circumstances: [¶] (1) After a judgment imposing a punishment other than imprisonment in the state prison. [¶] . . . ." By attention to the phrases "misdemeanor for all purposes" and "[a]fter a judgment imposing a [nonprison] punishment," our courts have long reasoned that a "wobbler," an offense that confers discretion as to felony or misdemeanor punishment, becomes a misdemeanor only *after* the judgment and hence retains its felony character for purposes of the limitations period. This was first announced for the offense of grand theft (*Doble* v. *Superior Court* (1925) 197 Cal. 556, 576-577 [241 P. 852]), which was and remains today punishable, in the discretion of the court, with jail/fine or prison time (§ 489, subd. (b)). (Accord, *People* v. *Mitchell* (1930) 109 Cal.App. 116, 117-118 [receiving stolen property]; *People* v. *Thompson* (1931) 114 Cal.App. 258 [299 P. 821] [uttering check with fraudulent intent]; *People* v. *Weaver* (1943) 56 Cal.App.2d 732, 737-738 [133 P.2d 818] [fraudulent insurance claims]; see also *Davis* v. *Superior Court* (1959) 175 Cal.App.2d 8, 20-22 [345 P.2d 513] [felony conspiracy to commit offense itself a misdemeanor].)

The People's argument would have merit had Stanfill been found guilty of embezzling property *exceeding* $400 in value and received a misdemeanor sentence, for the offense would in that case, as with grand theft (§ 489, subd. (b) ["imprisonment in a county jail not exceeding one year or in the state prison"]), be a true wobbler for which the court had discretion to choose

between misdemeanor and felony punishment (§ 514 [incorporating theft provisions generally]). What occurred, however, is that the jurors found Stanfill guilty of the misdemeanor offense, leaving the court *no discretion* but to impose misdemeanor punishment. (§§ 490, 514.) Thus, as where a jury finds guilt of only petty theft (*People* v. *Angelo* (1938) 24 Cal.App.2d 626, 628 [75 P.2d 614]; *People* v. *Meyers* (1918) 39 Cal.App. 244, 245 [178 P. 965]), the one-year statute applied (cf. *ibid.*). Stated differently, the petty theft found by the jury was not a "wobbler" to which section 17, subdivision (b), could apply. (See generally, *People* v. *Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 974 [60 Cal.Rptr.2d 93, 928 P.2d 1171].)

## C.  *Forfeiture*

Before turning to prejudice, we confront recent case law developments. The parties note the Supreme Court decision in *Cowan* v. *Superior Court* (1996) 14 Cal.4th 367 [58 Cal.Rptr.2d 458, 926 P.2d 438] (*Cowan*). *Cowan* abrogated long-settled precedent emanating from *People* v. *McGee* (1934) 1 Cal.2d 611 [36 P.2d 378] (*McGee*) that had viewed the statute of limitations as part of fundamental subject matter jurisdiction. In a limited retreat, *Cowan* decided that a defendant may, as part of a negotiated disposition, plead guilty to a time-barred lesser offense, provided he does so for his benefit and with an express informed waiver of the right to assert the statute. (*Cowan*, *supra*, at p. 374.) Distinguishing between an express waiver and " 'waiver' in the sense of forfeiture" by a mere failure to assert the right (*id.* at p. 372), *Cowan* left for another day whether to overrule precedent further "and hold that the statute of limitations in criminal cases is an affirmative defense, which is forfeited if a defendant fails to raise it before or at trial" (*id.* at p. 374).

In *People* v. *Williams* (1999) 21 Cal.4th 335 [87 Cal.Rptr.2d 412, 981 P.2d 42] (*Williams*), decided last August, a five-member majority of the Supreme Court declined to erode precedent further, at least where a defendant is convicted *as charged* with a time-barred offense and then objects for the first time on appeal. "We conclude that a defendant may not inadvertently forfeit the statute of limitations and be convicted of a time-barred charged offense. We maintain the rule that if the charging document indicates on its face that the charge is untimely, absent an express waiver, a defendant convicted of that charge may raise the statute of limitations at any time." (*Id.* at p. 338.) The majority held the creation of a forfeiture rule "bad policy," citing the risk that a defendant might "accidentally" lose the right if, for example, he pled guilty having waived his right to counsel. (*Id.* at p. 341.) Noting, too, that the majority of other jurisdictions, while rejecting California's pre-*Cowan* view of the limitations issue, lacked a uniform approach to forfeiture

versus express waiver, the majority decided, "We believe our long-standing nonforfeiture rule is preferable when the defendant is convicted of the charged offense and the charging document indicates the action is time-barred." (*Id.* at p. 342.) Also of concern was that to announce a new forfeiture rule in that situation "would be an exercise in futility" because a represented defendant could simply claim ineffective assistance of counsel and often, as in the case before them, with "no possible tactical reason for [the] defendant not to [have sought] to have the charge dismissed." (*Ibid.*) This meant that "[d]efendants would usually gain indirectly by claiming ineffective assistance of counsel what a forfeiture rule would prevent them from gaining directly. A forfeiture rule would merely add a step to the litigation." (*Ibid.*)

However, the *Williams* majority confined its holding to the situation before it, saying, "We leave to future appellate courts to decide other questions not involved here, such as the proper rules to apply to convictions of time-barred lesser offenses when the charged offense is not time-barred." (*Williams, supra,* 21 Cal.4th at p. 338.) Of special interest to us, it considered an argument "that a forfeiture rule would avoid 'gamesmanship,' and that without such a rule defense counsel might 'sandbag' the trial court." (*Id.* at p. 346.) This was rejected: "The 'gamesmanship' argument is generally made in the context of convictions of time-barred lesser offenses when the charged offense is timely. [Citations.] Although *McGee* itself applied only 'where the pleading of the state shows that the period of the statute of limitations has run' [citation], some intermediate appellate court decisions have extended its rule to convictions of lesser offenses. [Citation.] Conviction, by plea or otherwise, of a lesser offense than the one charged involves separate concerns and problems not present here. Issues regarding lesser offenses may arise in a variety of factual contexts. We express no opinion on the proper resolution of any such questions but leave them for future appellate courts to decide in cases that actually present them. Today's decision involves only a conviction of a charged offense that, so far as the face of the charging document shows, is untimely." (*Ibid.*, fn. omitted.)

The parties agree there was no express waiver here. Our case does, however, pose a model example of conviction of a time-barred lesser offense "when the charged offense is not time-barred" (*Williams, supra,* 21 Cal.4th at p. 338), and so we take up the *Williams* majority's invitation to decide whether a forfeiture should result in this situation. Justices Kennard and Brown, who dissented in *Williams* and favored viewing the statute as a defense, obviously would endorse forfeiture in this situation. Justice Brown specifically chided the majority for encouraging " 'gamesmanship and sand-bagging' " in precisely our situation. (*Id.* at p. 350 (dis. opn. of Brown, J.).)

The rise of *McGee*'s application to lesser offenses was chronicled in a concurring and dissenting opinion authored by Justice Brown in *Cowan*. She wrote: "[W]hen we decided *McGee* in 1934, we opted for a jurisdictional approach based on our contemporaneous assessment that it was 'the more desirable rule.' (*McGee, supra,* 1 Cal.2d at p. 613.) With the subsequent proliferation of lesser related and lesser included offenses, however, the approach began to have some unexpected consequences. For example, in *People* v. *Rose* (1972) 28 Cal.App.3d 415 . . . , the defendant was charged with murder. (*Id.* at p. 416.) The trial court instructed the jury on both murder and the lesser offense of voluntary manslaughter. (*Ibid.*) After the defendant was convicted of voluntary manslaughter, the Court of Appeal, on its own motion, reversed the conviction on statute of limitations grounds. (*Id.* at pp. 416-418.) The court acknowledged that 'the state of the record may be the result of defense strategy pointed at preventing the jury from having to choose between murder and acquittal.' (*Id.* at p. 417.) Nonetheless, citing *McGee, supra,* 1 Cal.2d 611, the court concluded that 'the conviction is jurisdictionally defective and must be reversed.' (*People* v. *Rose, supra,* at p. 417.) In *People* v. *Morgan* (1977) 75 Cal.App.3d 32, 35-37 . . . , the Court of Appeal reached a similar conclusion with respect to an involuntary manslaughter conviction.

"Even more anomalous is *People* v. *Brice* (1988) 206 Cal.App.3d 111 . . . , a case in which the defendants themselves requested the lesser offense instruction at issue. In *Brice*, the defendants were charged with murder and conspiracy to commit murder. (*Id.* at p. 114.) The trial court acceded to their request for a lesser offense instruction on the crime of being accessories to murder. (*Ibid.*) Following its deliberations, the jury acquitted the defendants of murder and conspiracy but convicted them of being accessories to murder. (*Ibid.*) On appeal, the defendants argued that their convictions must be reversed because 'although they requested instruction on the lesser related offense, they did not waive the statute of limitations which bar[red] their conviction for that offense.' (*Id.* at p. 115.) Relying on *McGee, supra,* 1 Cal.2d 611, the Court of Appeal agreed. (*People* v. *Brice, supra,* at pp. 114-116.) In his concurring opinion, Justice Brauer pointed out the absurdity of this result: 'At trial, the defendants demanded accessory-after-the-fact instructions . . . . When the jury convicted them of that offense, they garnered an unexpected windfall: they escaped scot-free on that charge because the statute of limitations had run.' (*Id.* at pp. 116-117 (conc. opn. of Brauer, J.).)" (*Cowan, supra,* 14 Cal.4th at pp. 385-386 (conc. & dis. opn. of Brown, J.).)

That summary exposes the potential for gamesmanship and sandbagging by the defense. Settled California law holds that, ". . . even absent a

request, and even over the parties' objections, the trial court must instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser. [Citations.]" (*People* v. *Birks* (1998) 19 Cal.4th 108, 118 [77 Cal.Rptr.2d 848, 960 P.2d 1073].) The rule benefits the People and the defendant, for it "prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other. Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither 'harsher [n]or more lenient than the evidence merits.' [Citations.]" (*Id.* at p. 119; accord, *Spaziano* v. *Florida* (1984) 468 U.S. 447, 455 [104 S.Ct. 3154, 3159, 82 L.Ed.2d 340] [absence of a lesser included offense instruction "increases the risk that the jury will convict, not because it is persuaded that the defendant is guilty of capital murder, but simply to avoid setting the defendant free"].) A similar rule requiring instruction on lesser *related* offenses (upon defense request) was recently overruled (*People* v. *Birks, supra,* 19 Cal.4th at p. 136) but had been formulated to serve the same interests (*id.* at pp. 119-121, discussing *People* v. *Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055]).

Until *Cowan*'s holding that a defendant may knowingly waive the statute of limitations, it was assumed that a defendant had no right to receive jury instruction on a time-barred lesser offense (*Cowan, supra,* 14 Cal.4th at p. 386 (conc. & dis. opn. of Brown, J., discussing *People* v. *Ognibene* (1993) 12 Cal.App.4th 1286 [16 Cal.Rptr.2d 96]), and while *Cowan* has since urged all trial courts and prosecutors to beware of limitations problems and to secure an informed waiver as a condition of instruction whenever doubt arises (*Cowan, supra,* at pp. 376-377), the case before us shows that this advice is missing its audience. Stanfill was tried almost a year after *Cowan* was decided, yet the record shows no inquiry into the limitations problem and no waiver.

Thus the prospect of gamesmanship or sandbagging persists. Just as a defendant before *Cowan* was tempted to remain quiet about an expired statute of limitations in order to secure the advantage of lesser offense instruction yet have any conviction reversed on appeal, so a defendant after *Cowan* has an incentive to do basically the same thing. Without a rule that acquiescence or failure to object acts as a forfeiture, the defendant may remain quiet about a limitations problem, avoid the ritual of formal waiver and then, as an ace up his sleeve, secure reversal on the theory that he never expressly waived. This is an unconscionable result that calls for a forfeiture rule. Beyond removing the incentive for gamesmanship, "requiring a defendant to raise a statute of limitations issue in the trial court . . . . would

encourage the parties to focus on the issue at that level, where it can be fully explored and an adequate record developed." (*Cowan, supra,* 14 Cal.4th at p. 387 (conc. & dis. opn. of Brown, J.).) We would also prevent surprise and prejudice to the prosecution. Because lesser included offenses are not charged in the accusatory pleading, ". . . there is no reason for the prosecution to include discovery or tolling allegations as to those offenses. [Citations.]" (*Id.,* at p. 387, fn. 2.) Raising the issue in the trial court would allow an opportunity to amend the accusatory pleading to rectify those situations where tolling provisions might apply to the lesser offense. (*Ibid.*; cf. *People v. Rose* (1972) 28 Cal.App.3d 415, 418 [104 Cal.Rptr. 702] [reversing but remanding to allow amendment for retrial purposes]; *People v. Morgan* (1977) 75 Cal.App.3d 32, 38-41 [141 Cal.Rptr. 863] [same].) Finally, proper resolution of the issue in the trial court would, of course, remove any need for an appeal, reversal and retrial on that issue, a delay that could prejudice both parties by fostering stale evidence and dull memories (*Cowan, supra,* 14 Cal.4th at p. 387 (conc. & dis. opn. of Brown, J.))—paradoxically, the key reasons for having a statute of limitations in the first place.

On the other hand, a forfeiture rule could trap an unwary defendant who (1) did not know of the limitations bar, (2) was not apprised of it by trial counsel and (3) would not have wanted the lesser offense instruction had he known. Since such factual matters are seldom answered on the appeal record, the likely mode of redress would be a petition for habeas corpus raising a claim of ineffective assistance of counsel, a prospect stressed heavily in *Williams* as a reason for *not* declaring a forfeiture rule in the context where a charging document indicates on its face that an offense is time-barred. (*Williams, supra,* 21 Cal.4th at pp. 342-343.) We are not convinced, however, that this concern is as great in the context of lesser included offenses. It is uncharacteristic of our Supreme Court to be deterred by the prospect of ineffective assistance claims. The court has condemned the practice of reaching barred issues on appeal in the " 'interest of judicial economy' " just to stem a flow of habeas corpus petitions. (*People v. Panizzon* (1996) 13 Cal.4th 68, 89, fn. 15 [51 Cal.Rptr.2d 851, 913 P.2d 1061] [claims statutorily barred by failure to obtain certificate of probable cause].) What struck the *Williams* majority was that most ineffective assistance claims *would have merit* where the offense had appeared time-barred on the face of the accusatory pleading. One could tactically justify a defendant pleading guilty to a facially time-barred charge if it was part of a plea bargain where all other charges were more serious and dismissed, but ordinarily there would be "no possible tactical reason for defendant not to seek to have the charge dismissed." (*Williams, supra,* 21 Cal.4th at p. 342; see, e.g., *U.S. v. Hansel* (2d Cir. 1995) 70 F.3d 6, 8.) The same is not true in our context, where the time-barred offense is lesser included within a

charged offense that was not time-barred. Where an instruction is given, for example, it will ordinarily appear that acquiescence to the time-barred lesser had the tactical advantage of giving jurors a choice between the greater offense and acquittal and was thus a rational strategy. It is a petitioner's burden to show that ". . . counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome. [Citations.]" (*In re Visciotti* (1996) 14 Cal.4th 325, 352 [58 Cal.Rptr.2d 801, 926 P.2d 987].) Neither prong of the claim would be a foregone conclusion in our context. Even if a petitioner could show deficient performance in counsel's failing to discover a time bar or to make an issue of it at trial, he would still have to show a reasonable probability both that his acquiescence in the instruction would have changed and that any such change would have yielded a more favorable result. And if the time problem had been not clear, but a factual question for the jury, a petitioner would have to show, further, a reasonable probability of success on that jury question (*Com.* v. *Groff* (1988) 378 Pa.Super. 353, 372-373 [548 A.2d 1237, 1247]), a task perhaps doomed by a record insufficiently developed on the factual question (cf. *U.S.* v. *Oliva* (3d Cir. 1995) 46 F.3d 320, 325). Here then, in contrast to the context in *Williams*, a habeas corpus petition would not be inevitable, would not commonly have merit and thus would not "merely add a step to the litigation." (*Williams, supra,* 21 Cal.4th at p. 342.) Finally, meritorious claims would remain redressable by habeas corpus; forfeiture regarding the statute of limitations should operate no more harshly than with other forfeiture rules.

■ On balance, we hold that a defendant forfeits the right to complain on appeal of conviction of a time-barred lesser included offense where the charged offense was not time-barred and the defendant either requested or acquiesced in the giving of instructions on the lesser offense. In other words, a defendant must raise the issue in the trial court in order to preserve it for appeal. We depart from prior Court of Appeal opinions to the contrary, for they predate *Cowan* and *Williams*, operate under the now-abrogated rule that the statute of limitations is jurisdictional in the fundamental sense, and accordingly did not weigh the policy factors we have articulated. This rule of forfeiture does not detract from the advice of the Supreme Court in *Cowan* and *Williams* that trial courts and prosecutors should, whenever instructions on lesser included offenses are considered, determine whether there may be a problem with the statute of limitations and, if so, elicit a waiver of the statute as a condition of giving the instruction. (*Cowan, supra,* 14 Cal.4th at pp. 376-377; *Williams, supra,* 21 Cal.4th at p. 346, fn. 5.) That remains the better course, for it removes all ambiguity.

### D. *Applying Forfeiture Here*

Having adopted a rule of forfeiture, the question remains whether we may properly apply that rule in this case. We are constrained by precedent to say we cannot and that the rule we adopt therefore only applies to cases tried after this opinion becomes final.

The Supreme Court in *Cowan* had no occasion to consider whether its abrogation of the strict jurisdictional rule of *McGee* could apply to cases already tried; the case arose on a writ petition by the defendant to allow waiver of the statute of limitations on a lesser included offense as part of a plea bargain that avoided trial on capital charges. (*Cowan, supra,* 14 Cal.4th at pp. 370, 377.) One Court of Appeal decision, however, has declined to give *Cowan* retroactive operation, reasoning: "Because *Cowan* announced a change in the long-standing rule of criminal procedure relating to trial court jurisdiction over time-barred lesser offenses, we conclude that the fair administration of justice requires that the rule announced in *Cowan* be given prospective application only, i.e., to cases tried after the date it was decided. Prospective application would conform with past decisions of the Supreme Court. [Citations.]" (*People* v. *Greenberger* (1997) 58 Cal.App.4th 298, 371-372 [68 Cal.Rptr.2d 61].) The opinion cites for that proposition authority dealing not with waiver, but with decisions announcing for the first time rights for the defendants to have instructions on lesser related offenses (*People* v. *Geiger, supra,* 35 Cal.3d at p. 532, fn. 13) and imperfect self-defense (*People* v. *Murtishaw* (1989) 48 Cal.3d 1001, 1012-1014 [258 Cal.Rptr. 821, 773 P.2d 172]).

Authority closer to our case nevertheless dictates the same result, at least as to our adoption of a rule of forfeiture. In *People* v. *Welch* (1993) 5 Cal.4th 228 [19 Cal.Rptr.2d 520, 851 P.2d 802], the Supreme Court announced that a defendant who fails to object at the time of sentencing to a probation condition forfeits the right to challenge on appeal the reasonableness of that condition. (*Id.* at pp. 234-237.) But the holding was not given effect in that case, the court explaining: "Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence. [Citations.] By the same token, defendant should not be penalized for failing to object where existing law overwhelmingly said no such objection was required. [Fn. omitted.] It would be unfair to effectively bar any review of defendant's claims where the rule requiring their preservation in the trial court was adopted in the context of her own appeal. Therefore, the objection and waiver rule announced herein shall not apply to defendant or any other litigant whose probation conditions were considered at a sentencing hearing

held before the instant decision becomes final. [Citations.]" (*Id.* at pp. 237-238.)

An unsavory result of prospective-only application here is that it could reward any gamesmanship in this case. We cannot tell from the record whether the lack of objection was strategic sandbagging or just oversight, but the Supreme Court has denied retroactive effect to forfeiture rules despite the prospect of sandbagging. In *People* v. *Collins* (1986) 42 Cal.3d 378 [228 Cal.Rptr. 899, 722 P.2d 173] (*Collins*), the court adopted the federal *Luce* rule (*Luce* v. *United States* (1984) 469 U.S. 38 [105 S.Ct. 460, 83 L.Ed.2d 443]) that a defendant must testify in order to preserve for appellate review a claim of abuse of discretion in the trial court's ruling to allow his impeachment with a prior conviction. Lack of a forfeiture rule, it was noted, encouraged the defendants to seek an impeachment ruling simply to plant reversible error in the event of conviction. (42 Cal.3d at pp. 384-385.) Nevertheless, the rule was not applied in that case: "Under our prior decisions on this question a defendant was not required to testify in order to preserve for appeal a claim of improper impeachment by prior conviction; indeed, he was not even asked to make an offer of proof. [Citation.] . . . Thus our decision to adopt the *Luce* requirement establishes a new rule of law when there was a previous rule in this state to the contrary; in such circumstances we have the option of giving it prospective effect on policy grounds. [Citation.] [¶] Considerations of fundamental fairness compel us to exercise that option. To deny defendants their right to appeal on this issue because they failed to testify—after we repeatedly told them they need not do so—would be to change the rules after the contest was over. When the contest is as serious as a criminal prosecution, such unfairness would be intolerable. For this reason the *Luce* rule will apply only prospectively to trials beginning after this decision is final. [Citation.]" (*Collins, supra,* 42 Cal.3d at p. 388, citing *People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 712-716 [135 Cal.Rptr. 392, 557 P.2d 976] [new rule that review of orders certifying juveniles for prosecution as adults will be deemed waived unless defendant files a timely petition for extraordinary writ, held prospective only].)

We might distinguish our case as lacking Supreme Court as opposed to Court of Appeal precedent on the preexisting rule; *Williams* noted that the Supreme Court itself had never extended *McGee* to convictions of lesser uncharged offenses (*Williams, supra,* 21 Cal.4th at p. 346). But this difference has not moved the Supreme Court to alter the outcome where, as here, Court of Appeal precedent is long settled. In *People* v. *Scott* (1994) 9 Cal.4th 331 [36 Cal.Rptr.2d 627, 885 P.2d 1040] (*Scott*), the court held that a defendant who fails to challenge at sentencing the trial court's reasons for

choices made under the determinate sentencing law forfeits the claim on appeal. This had never been decided by the Supreme Court and reflected the minority view in Court of Appeal decisions. (*Scott, supra,* at pp. 352-353 and fn. 16.) The rule was not applied in that case. "Before today's decision . . . , the clear weight of authority had broadly held or assumed that errors in the court's sentencing choices and statement of reasons could not be waived. For the most part, treatises and secondary authorities have ignored the contrary minority view; they either fail to warn litigants that they must object in order to preserve such issues or they affirmatively state that no objection is required. [Fn. omitted.] As a result, it appears that sentencing hearings have been conducted in a manner that has discouraged, disallowed, and discounted objections to the type of claims raised by defendant. Because our holding effectively changes the circumstances under which such claims are litigated, and may require substantial practical alterations in the way sentencing proceedings are routinely conducted, today's decision does not apply to cases in which the sentencing hearing was held before our decision becomes final." (*Id.* at pp. 357-358.)

Here, while the Supreme Court has not spoken, our decision contradicts a 27-year history of other Court of Appeal decisions—some, incidentally, authored by justices who would later sit on the Supreme Court (*People* v. *Rose, supra,* 28 Cal.App.3d 415 (Kaus, P. J.); *People* v. *Morgan, supra,* 75 Cal.App.3d at pp. 35-37 (Reynoso, J.)). There have been no minority decisions to the contrary and, of course, no treatises or other practice guides to warn the bench and bar of a forfeiture rule. Under these circumstances, we must give our holding prospective-only effect. (Contrast *People* v. *Frazer* (1999) 21 Cal.4th 737 [88 Cal.Rptr.2d 312, 982 P.2d 180] [no constitutional infirmity in Legislature's statutory resurrection of time-barred sex offenses].)

### E.   *Prejudice From the Instructional Error*

■   The parties disagree on the standard of prejudice for assessing the statute of limitations error. Stanfill urges per se reversal, claiming that failure to instruct on the proper one-year limitation period was tantamount to error omitting an element of the offense and a structural defect not susceptible of harmless error review. The People urge that we should apply the *Chapman* standard of harmless beyond a reasonable doubt (*Chapman* v. *California* (1967) 386 U.S. 18, 36 [87 S.Ct. 824, 833-834, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]).

The People are correct. As they note, there is case law suggesting that such error may be structural and require per se reversal (*People* v. *Bell*

(1996) 45 Cal.App.4th 1030, 1065-1067 [53 Cal.Rptr.2d 156] [ultimately not deciding because there was prejudice under *Chapman*]), but this predates the Supreme Court's *Cowan* analysis relaxing the jurisdictional view of the statute of limitations. It also predates *People v. Flood* (1998) 18 Cal.4th 470 [76 Cal.Rptr.2d 180, 957 P.2d 869] (*Flood*), in which our Supreme Court held that incorrect or missing instruction on an element of an offense is due process error generally subject to *Chapman* and state (Cal. Const., art. VI, § 13) harmless error analysis, and is not structural error. (*Flood, supra,* at pp. 482-504.) Finally, it predates another postbriefing decision, *Neder v. United States* (1999) 527 U.S. 1 [119 S.Ct. 1827, 144 L.Ed.2d 35] (*Neder*), where a majority on the federal high court resolved the *Chapman* question, reining in some earlier case law pronouncements to hold that *Chapman* analysis applies to error in omitting instruction on an element of an offense. (*Neder, supra,* 527 U.S. at pp. 7-17 [119 S.Ct. at pp. 1833-1837].) Thus, it develops, our state Supreme Court in *Flood* correctly anticipated the federal high court's ultimate resolution of the issue.

*Neder* articulates the *Chapman* test most basically as, "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" (*Neder, supra,* 527 U.S. at pp. 18-19 [119 S.Ct. at p. 1838].) More closely taylored to the problem here, error is harmless "where an omitted element is supported by uncontroverted evidence," as "where a defendant did not, and apparently could not, bring forth facts contesting the omitted element . . . ." (*Ibid.*) Stated differently: "[A] court . . . asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If the answer to that question is 'no,' holding the error harmless does not 'reflec[t] a denigration of the constitutional rights involved.' [Citation.]" (*Id.* at p. 19 [119 S.Ct. at p. 1839].)

Thus the question here is: Does the record contain evidence that could rationally lead to a finding that Stanfill was guilty of the offense based on conduct occurring before April 23, 1996, the cutoff date for a misdemeanor conviction? Our task is informed by the verdict. By acquitting Stanfill of the felony, which might have been based on *any* embezzlement of public funds, not just public funds exceeding $400, jurors implicitly found no embezzlement of *any* of the cash, only embezzlement of other property such as the tools and equipment. Also, by finding an aggregate use value less than $400 under a unanimity instruction that told them only *one* act was required, we can see that any single embezzlement occurring before the cutoff date—even a brief one—supports prejudice, i.e., a finding contrary to the omitted time limitation.

We conclude that there *was* evidence to support a rational finding of the offense before the limitations cutoff. The joystick seems the most obvious

choice and may have been a particularly attractive item for the jury to rely on, since it was an item witnesses saw Stanfill *using*, as opposed to just storing somewhere, and since Stanfill did not deny using it for himself. He conceded using it but claimed he bought it with $50 of his own money and had never asked Ludlow to falsify the receipt but actually did buy manuals (never found, incidentally). This is not to say that the stored property had no "temporary use" value (the term used in the instructions), but jurors had no instruction on how to assess such value, making their reliance on the joystick all the more probable. No attention to use value, as opposed to cost or purchase value, was paid in the testimony either.

Stuart Ludlow said he bid and ordered the new computer system for Stanfill in September 1995 and that he later made the purchase of the joystick for Stanfill, creating a phony invoice for manuals. While Ludlow did not specify the date of the joystick order or his observation of Stanfill using it to play games, he did testify that he worked under Stanfill's supervision on Fridays from the summer of 1995 through January 1996, *all* of which was before the cutoff date of April 23, 1996. The order (People's exhibit No. 11) bears the date December 29, 1995. This makes it unnecessary to consider, in addition, evidence of other property Stanfill placed in his garage or Nichols's hangar before the cutoff date.

In conclusion, and treating the still-jurisdictional limitations period as analogous to an element of the crime in California (*Williams, supra,* 21 Cal.4th at pp. 337-338), the record does contain "evidence that could rationally lead to a contrary finding with respect to the omitted element" (*Neder, supra,* 527 U.S. at p. 19 [119 S.Ct. at p. 1839]), and we cannot say it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." (*Id.* at p. 18 [119 S.Ct. at p. 1838].)

Needless to say, given the supremacy of the federal Constitution and high court precedent in this context, we are confident that the error is also prejudicial under the federal and state tests as articulated in *Flood, supra,* 18 Cal.4th at pages 490-503.

## II.  *Restitution Issues*

Given our need to reverse for the statute of limitations instructional error, and the uncertainty whether Stanfill will be retried on the misdemeanor offense, there is no compelling reason to reach the restitution issues.

## DISPOSITION

The judgment is reversed.

Kline, P. J., and Ruvolo, J., concurred.